United States Court of Appeals,

Fifth Circuit.

No. 93-2403.

Alberto KREIMERMAN, et al., Plaintiffs-Appellants,

v.

CASA VEERKAMP, S.A. de C.V., et al., Defendants-Appellees.

June 15, 1994.

Appeal from the United States District Court for the Southern District of Texas.

Before KING and WIENER, Circuit Judges, and ROSENTHAL,[*] District Judge.

WIENER, Circuit Judge.

Plaintiffs-Appellants Alberto Kreimerman, Hermes International, Inc. and Hermes Trading Company d/b/a Hermes Music (collectively "Kreimerman et al.") sued Defendants-Appellees Casa Veerkamp, S.A. de C.V., Walter Veerkamp, Electronica Solida Mexicana, S.A., and Jorge R. Mendez (collectively "Veerkamp et al.")[1] for libel, civil conspiracy, and slander. Kreimerman et al. served process on the defendants, all of whom are residents of Mexico, by direct mail through the Texas Secretary of State under the Texas Long-Arm Statute,[2] but the district court quashed this service, holding that the Inter-American Convention on Letters

---

[*]District Judge of the Southern District of Texas, sitting by designation.

[1]Electronica Solida Mexicana, S.A. and Jorge R. Mendez have not appeared and are not parties to this appeal.

[2]Tex.Civ.Prac. & Rem.Code § 17.041, *et seq.*

1

Rogatory (the Convention),[3] a multi-national treaty designed to facilitate service of letters rogatory among the signatory nations, was the exclusive means of effecting service on the defendants. After Kreimerman et al. tried long and hard—but unsuccessfully—to accomplish service on the defendants through the use of letters rogatory pursuant to the Convention, they appealed the district court's decision to quash their service on the defendants under the Texas Long-Arm Statute, arguing—inter alia—that the Convention does not preempt other methods of service. They also appealed that court's refusal to grant a third extension of time within which service could be accomplished pursuant to the Convention.

## I

## FACTS AND PROCEEDINGS

Alberto Kreimerman is the sole owner and stockholder of Hermes Music and Hermes International, Inc., which sell numerous music related products. Both companies have their principal places of business in Hidalgo County, Texas, where Kreimerman resides. Walter Veerkamp, who resides in Mexico, D.F. (Mexico City), in the United States of Mexico (Mexico), is the owner of Casa Veerkamp, S.A. de C.V., which also sells music related products and which has its principal place of business in Mexico.

Kreimerman et al. sued Veerkamp et al. in Texas state court

---

[3]Inter-American Convention on Letters Rogatory (hereinafter "the Convention"), January 30, 1975, S. TREATY DOC. No. 27, 98th Cong., 2d Sess. (1984).

for libel, civil conspiracy, and slander,[4] serving process on all defendants through the Texas Secretary of State under the Texas Long-Arm Statute. Veerkamp et al. removed the case to the United States District Court for the Southern District of Texas, Houston Division. They also moved to dismiss the action for lack of jurisdiction and improper service. Kreimerman et al. responded to Veerkamp et al.'s motion and requested that the case be remanded to state court or, alternatively, that it be transferred to the McAllen Division of the Southern District of Texas, which was the proper venue division for the case.[5] The court denied all motions except the motion to quash service, which it granted on the ground that the Convention established the exclusive means of serving process on defendants residing in a signatory State.

Following the court's decision to quash service under the long-arm statute, Kreimerman et al. moved to extend the time to serve all defendants and requested the district court to issue four letters rogatory for service of process under the terms of the Convention. The letters were issued and forwarded to Mexico by Kreimerman et al.'s American counsel to be served on the defendants. Kreimerman et al. retained Mexican counsel in Ciudad Juarez (on the Mexican side of the Rio Grande River, across from El

---

[4]Kreimerman claimed that he was defamed when Veerkamp sent copies of an article from a Mexican political magazine and explanatory cover letters to some of Kreimerman's suppliers. The article (and the accompanying cover letters) apparently accused Kreimerman of being involved in drug trafficking, gun running, and money laundering.

[5]We address the issue of removal to the wrong division later.

3

Paso, Texas) to receive the letters and assist with such service. This counsel in turn hired another Mexican attorney, whose firm had offices in Mexico City, where the letters rogatory had to be filed. During the ensuing months, Kreimerman et al.'s Mexican counsel reported that the letters had been received and filed with the Federal District Court of Mexico, but that they had not yet been served, apparently because of the limited personnel available to serve process in international cases. As his time to effect service ran out, Kreimerman et al. requested a second extension of time to serve the defendants, and this request was granted too.

Prior to the expiration of the third deadline, Kreimerman et al.'s counsel in Mexico represented that service of the letters rogatory had been effected, but that there would be a delay in processing the returns. Kreimerman et al. wrote to the court, notifying it that service had been effected, but that additional time was needed to obtain properly certified copies. Only after Veerkamp et al. subsequently moved for sanctions against Kreimerman et al.'s counsel for misrepresenting that service had been effected, did Kreimerman et al. learn that service had not in fact been effected. Apparently, the lawyer in Mexico City had continually misrepresented the true situation.

Kreimerman et al. again moved (for the third time) for additional time to complete service of letters rogatory in Mexico. The magistrate judge conducted an evidentiary hearing in which Kreimerman et al.'s motion to extend time for service and Veerkamp et al.'s motion to dismiss the action and issue sanctions were

4

reviewed. At the hearing, the magistrate judge denied Kreimerman et al.'s motion for a third extension, concluding that they would not be prejudiced by a dismissal because the applicable statute of limitations had been tolled while the suit was pending.[6] The magistrate judge also found that sanctions were not appropriate, but recommended that Kreimerman et al.'s case be dismissed without prejudice, thereby permitting them to refile later.

Kreimerman et al. filed written objections to the magistrate judge's recommendations, but the district court adopted them and dismissed the case before the timely-filed written objections were received by the court. Kreimerman et al. then moved for reconsideration but their motion was denied.[7] This appeal followed.

## II

## ANALYSIS

A. *Preemption*

The central question in this case is whether the Convention preempts all other conceivable means for effecting service on defendants who reside in Mexico. To the best of our knowledge, this question is *res nova* in this and all other United States courts of appeals. Significantly, the question whether service under the Texas Long-Arm Statute was validly accomplished under the

---

[6]These statutes of limitations presumably related to Kreimerman et al.'s actions against Veerkamp et al. under Texas law for libel, civil conspiracy, and slander.

[7]Kreimerman et al. also made a motion to reinstate the motion for reconsideration, or—if you will—to reconsider the motion for reconsideration.

5

facts of this case is *not* before us; neither does our interpretation of the Convention turn on the existence *vel non* of alternative methods of service that comport with notions of comity and other requirements of domestic and international law. Here, we simply need to determine whether the language, history, and purpose of the Convention indicate that it was devised to supplant all other means of effecting service on a defendant residing in a signatory nation other than the forum nation.

1. *Standards For Construing the Convention*

In construing a treaty—as in construing a statute—we begin with the language or text.[8] The text of a treaty must be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose."[9] Only when the language of a treaty—read in the context of its structure and purpose[10]—is

---

[8]*United States v. Alvarez-Machain,* 504 U.S. ----, ---- - ----, 112 S.Ct. 2188, 2193-94, 119 L.Ed.2d 441, 451-52 (1992); *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988); *Air France v. Saks,* 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985); *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134-35, 109 S.Ct. 1676, 1683-84, 104 L.Ed.2d 113 (1989).

[9]Vienna Convention on the Law of Treaties, May 22, 1969, art. 31(1), 8 I.L.M. 4 (1969) (hereinafter "Vienna Convention"); *accord Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (clear import and obvious meaning of treaty language control). Although the United States is not a party to the Vienna Convention, it regards the substantive provisions of the Vienna Convention as codifying the international law of treaties. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, Part III, introductory note (1986).

[10]Although several cases specify that the language of a treaty must be read "in context," *see, e.g., Eastern Airlines,*

6

ambiguous may we resort to extraneous information like the history of the treaty, the content of negotiations concerning the treaty, and the practical construction adopted by the contracting parties.[11] We have no dispensation "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial...."[12] Indeed, any such effort on our part "would be ... an usurpation of power, and not an exercise of judicial function."[13] Neither may we supply a *casus omissus,* for we have no authority to rewrite a treaty.[14] These canons of interpretation, however, do not

*Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991); *Schlunk,* 486 U.S. at 699, 108 S.Ct. at 2108, these cases do not define the word "context." As the language of a treaty—again, read in context—is regularly contrasted with information extraneous to the treaty (like the *travaux preparatoires* ), *see, e.g., Eastern Airlines, Inc.,* 499 U.S. at 535, 111 S.Ct. at 1493; *Chan,* 490 U.S. at 134, 109 S.Ct. at 1683-84, we can infer that the context of a treaty consists of insights drawn from the treaty document itself. Article 31(2) of the Vienna Convention confirms this inference, for it defines the context of a treaty as the text "*including its preamble and annexes,*" as well as contemporaneous instruments and agreements made by the parties to the treaty "in connection with the conclusion of treaty." Emphasis added. Obviously, inferences drawn from a treaty's structural organization (e.g., the titles of its articles and parts) are also part of the contextual analysis of a treaty. Such contextual analysis can and should inform our understanding the literal language of a treaty provision. Thus, when a court speaks of interpreting the language of a treaty in the context of its structure and purpose, it means construing the literal language of the treaty in light of its structural organization and its purpose—as reflected in the preamble and other parts of the treaty.

[11]*Eastern Airlines, Inc.,* 499 U.S. at 535, 111 S.Ct. at 1493; *Chan,* 490 U.S. at 135, 109 S.Ct. at 1684.

[12]*Chan,* 490 U.S. at 135, 109 S.Ct. at 1684 (quoting *The Amiable Isabella,* 19 U.S. (6 Wheat.) 32, 5 L.Ed. 191 (1821)).

[13]*Id.*

[14]*Id.*

indicate which of several competing interpretations we should favor in close cases.

Courts commonly declare that treaties are more "liberally construed" than contracts.[15] This does not mean, however, that treaty provisions are construed broadly. Rather, this "liberal" approach to treaty interpretation merely reflects—as indicated above—the willingness of courts, when interpreting difficult or ambiguous treaty provisions, to "look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties."[16] Indeed, existing precedents—though sparse—suggest that treaty provisions should be construed narrowly rather than broadly.[17] As treaties establish restrictions or limitations on the exercise of sovereign rights by signatory States, courts should interpret treaty provisions narrowly—for fear of waiving sovereign rights that the government or people of the State never intended to cede.[18] Ambiguous

---

[15]*See, e.g., Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985); *Eastern Airlines, Inc.,* 499 U.S. at 535, 111 S.Ct. at 1493.

[16]*Eastern Airlines, Inc.,* 499 U.S. at 535, 111 S.Ct. at 1493 (citations omitted).

[17]*See, e.g., The Case of S.S. Lotus (France v. Turkey),* [1927] P.C.I.J. Ser. A, No 10 at 18-19; *In re Extradition of Demjanjuk,* 612 F.Supp. 544, 555 (N.D.Ohio 1985) (citing the *S.S. Lotus* case for the proposition that the jurisdiction [to adjudicate] of sovereign States is unbounded unless explicitly prohibited).

[18]As "[t]he rules of law binding upon States ... emanate from their own free will as expressed in conventions or by usages generally accepted as expressing principles of law ... [r]estrictions upon the independence of States *cannot* therefore be presumed." *The Case of S.S. Lotus (France v. Turkey),* [1927]

provisions of a treaty should thus be interpreted to derogate minimally from the sovereign power of the State, which is the quintessential and most legitimate entity in international law.[19]

2. *Discussion*

The parties advance both textual (and contextual)[20] and non-textual (or extraneous) arguments in support of their respective interpretations of the Convention. Although the district court was persuaded that Kreimerman et al.'s attempt to serve process under the Texas Long-Arm Statute contravened the Convention, that court did not reveal which arguments it found especially telling. The absence of the trial court's reasons are inconsequential here, though, as the interpretation of treaty provisions is a question of law, freeing us to review the district court's conclusion *de novo*.[21] We consider the parties textual and non-textual arguments in turn.

a. *Textual Arguments*

---

P.C.I.J. Ser. A, No 10 at 18-19 (emphasis added); *In re Extradition of Demjanjuk,* 612 F.Supp. 544, 555 (N.D.Ohio 1985) (citing the *S.S. Lotus* case for the proposition that the jurisdiction [to adjudicate] of sovereign States is unbounded unless explicitly prohibited); *see also The Case of S.S. Wimbleton,* [1923] P.C.I.J. Ser. A, No. 1, at 25 (indicating that international treaties place restrictions on the exercise of the sovereign rights of signatory States).

[19]In this case, however, it turns out that the arguments weigh rather more heavily on one side than the other. Thus, we need not rely on any canon of interpretation to determine the outcome in this case: It is simply not that close.

[20]*See supra* footnote 10.

[21]*Sioux Tribe v. United States,* 205 Ct.Cl. 148, 500 F.2d 458, 462 (1974); *Cayuga Indian Nation of New York v. Cuomo,* 758 F.Supp. 107, 111 (N.D.N.Y.1991).

The only federal court to have reached the issue in a published opinion concluded that the Convention is *not* the exclusive means of serving process on defendants residing in a signatory State.[22] In so concluding, that court emphasized that the Convention does not expressly prohibit other means of service: The Convention "states that it shall apply to letters rogatory ... [but it] does not state that letters rogatory are the only means of serving process in the signatory countries."[23]

This is a telling dichotomy. The Convention does indeed merely state that it "shall apply to letters rogatory,"[24] rather than to any and all means of serving process. In contrast, the Hague Service Convention—by its own terms—"appl[ies] *in all cases, in civil or commercial matters, where there is occasion to transmit a judicial ... document for service abroad.*"[25] Similarly, the official title of the Convention is the Inter-American Convention on *Letters Rogatory,* whereas the official title of the Hague Service Convention is the Convention on the *Service Abroad of Judicial and Extrajudicial Documents* in Civil or Commercial Matters.[26] As rogatory letters (or letters of request) are—by

_____

[22]*Pizzabiocche v. Vinelli,* 772 F.Supp. 1245, 1249 (M.D.Fla.1991).

[23]*Id.*

[24]The Convention, ART. 2.

[25]Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 1, 20 U.S.T. 361, T.I.A.S. No. 6638 (hereinafter "Hague Service Convention") (emphasis added).

[26]*Id.* (emphasis added).

definition—merely one of many procedural mechanisms by which a court in one country may request authorities in another country to assist the initiating court in its administration of justice,[27] the Convention's scope appears to be limited to regulating that one procedural mechanism.  In contrast, the scope of the Hague Service Convention is much broader, applying as it does to *all* service abroad upon defendants residing within signatory States.

This facial difference in scope is reinforced by a comparison of the preambles of the two agreements.  The Convention's preamble is rather modest:  "The Governments of the Member States ... desirous of concluding a convention on letters rogatory, have agreed as follows...."[28]  The language of the Hague Service Convention is more peremptory:  "Desiring to create appropriate means to *ensure* that judicial and extrajudicial documents to be served abroad *shall be* brought to the notice of the addressee in sufficient time...."[29]

Neither does the Convention contain a clear statement of preemptive intent.  Yet the Supreme Court found the absence of such a "plain statement of a pre-emptive intent" significant in deciding that the Hague Evidence Convention did not preempt other methods of

---

[27]*See, e.g.,* Fed.R.Civ.P. 4(f) & 28(b) (in which letters rogatory are listed as but one of several possible means of effecting service upon or deposing foreign residents).

[28]The Convention, preamble.

[29]The Hague Service Convention, preamble (emphasis added).

11

discovery.[30]

Thus, nothing in the language of the Convention expressly reflects an intention to supplant all alternative methods of service. Rather, the Convention appears solely to govern the delivery of letters rogatory among the signatory States.

Veerkamp et al. also point to mandatory language found in the Convention and insists that similar language led the Supreme Court in *Volkswagenwerk Aktiengesellschaft v. Schlunk* to conclude that the Hague Service Convention preempted other methods of service.[31] The significance of such mandatory language, however, depends on the context in which it is used. In the Convention, all of the mandatory language refers to what must be done with respect to letters rogatory; none of it remotely indicates that the procedures outlined in the Convention must be followed by the signatory nations for anything other than the processing of letters rogatory.[32] In contrast—as noted above—the Hague Service Convention applies "in all cases ... where there is occasion to transmit a

---

[30]*Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 539, 107 S.Ct. 2542, 2553, 96 L.Ed.2d 461 (1987).

[31]*See Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988) (noting the mandatory language of art. 1).

[32]For example, the Convention indicates that it "shall apply to letters rogatory," Convention, art. 2, that execution of such letters by the receiving state "shall not imply ultimate recognition of the [sending authority's] jurisdiction," *Id.* art 9, and that "[l]etters rogatory shall be executed in accordance with the laws ... of the State of destination." *Id.* art. 10.

12

judicial ... document abroad."[33]  It was precisely *this* mandatory language—not mandatory language in general, but mandatory language specifically addressing the *scope* of the Hague Service Convention—that the Supreme Court found so persuasive in *Schlunk*.[34]

Veerkamp et al. also argue that article 15 of the Convention

---

[33]Hague Service Convention, art. 1.

[34]486 U.S. at 699, 108 S.Ct. at 2108.  Interestingly enough, the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (hereinafter "Hague Evidence Convention"), March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, also contains mandatory language, yet the Supreme Court concluded that the Hague Evidence Convention does *not* preempt other methods of discovery previously employed by common-law courts. *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).  For example, the Hague Evidence Convention indicates that a contracting State *must* designate a Central Authority for receipt of letters of request.  Hague Evidence Convention, art. 2.  Here we find mandatory language;  yet that language tells us nothing about whether the treaty is preemptive or not.

Indeed, it is common for treaty regimes to have mandatory language that tells signatories what they must do to execute particular provisions of the treaties.  But again, such language tells us nothing about the scope of the treaties themselves.  Analogously, mandatory language to the effect that "no one may smoke in the doctor's waiting room," indicates nothing about *when* we must wait in the waiting room.  It gives us a rule for what we must do once there, but it does not tell us when we must be there.  In this case, Veerkamp et al. are essentially arguing that mandatory language indicating what we must or must not do once in the waiting room (once the Convention is triggered) informs us when we must wait in that room (when the Convention is triggered).  Such a contention is logically insupportable.  In summary, the context in which mandatory language is used determines the relevance of such language to the inquiry at hand.  Simply noting that a treaty contains mandatory language is unavailing.  Because the mandatory language in the Hague Evidence Convention has nothing to do with the scope of the treaty, the Court evidently perceived that the language is not probative of whether the treaty preempts other methods of discovery.  *See generally* 482 U.S. 522, 107 S.Ct. 2542.

demonstrates that the Convention was intended to preempt other methods of service.  Article 15 provides that "[t]his convention shall [1] not limit any provisions regarding letters rogatory in bilateral or multilateral agreements that may have been signed or may be signed in the future by the States Parties or [2] preclude the continuation of more favorable practices in this regard that may be followed by these States."[35]  The first clause clearly permits contracting States to maintain alternative treaty-based procedures *for transmitting letters rogatory.*  The second clause, however, is more difficult.

Veerkamp et al. interpret this second clause to permit contracting States to continue other more favorable service practices when those practices are agreed upon by all effected States.  In other words, Veerkamp et al. construe this clause to *prohibit* continuation of *unilateral* service practices by contracting States.  There is modest support for this construction in the State Department's comments on article 15 of the Convention, which declare that article 15 "authorizes the continuance of practices *between* states *concerning letters rogatory* which may be less restrictive than those prescribed by the Convention."[36]  There is, however, more to be said against this construction than in its favor.

The second clause of article 15 can reasonably be read as *affirmative permission* for signatory states to continue "more

---

[35]The Convention, art. 15.

[36]Treaty Doc. 98-27, p. viii (emphasis added).

14

favorable practices" even if those practices are exercised *unilaterally.*[37] Article 15 simply states that the Convention does not "preclude continuation of more favorable practices by [contracting] States." This article indicates nothing about whether those practices must be assented to by other signatory nations. Neither do the State Department's comments necessarily support the position—held by Veerkamp et al.—that pre-existing State practices may be continued only if assented to by other States; for the word "between" may simply mean "among the contracting States," rather than "agreed upon by the contracting States" as Veerkamp et al. suggest.

Moreover, even if article 15 does not affirmatively permit continuance of unilateral state practices, there is still a palpable leap of logic in asserting that article 15's express authorization of certain mutually-accepted practices implicitly forbids others not so expressly authorized. Ironically, this same leap of logic is mirrored in the larger question at issue here, as Veerkamp et al. can just as easily argue—and do so argue—that the very existence of the Convention on Letters Rogatory implies the proscription of other practices not permitted by the Convention. As discussed later, however, the Supreme Court does not accept this

---

[37]Interpreting article 15 to permit continuance of unilateral service of process practices by individual contracting States is not at all far-fetched. Indeed, the Hague Evidence Convention has a provision that does exactly that—permit continuance of unilaterally-adopted procedures for discovery of evidence. *See* The Hague Evidence Convention, art. 27; *Societe Nationale Industrielle Aerospatiale,* 482 U.S. at 537-38, 107 S.Ct. at 2552-53.

15

argument with respect to other conventions, and Veerkamp et al. provide us with no good reason to accept the argument here either: Their leap of logic remains just that —a leap.

Significantly, even if Veerkamp et al.'s assertion that article 15 does not authorize the continuation of unilaterally-exercised State practices were correct, it would not help them. As the language of article 15 appears to address only those treaties and State practices that pertain to *letters rogatory,* the article has nothing to say about other procedures for service of process. The expression "practices in this regard" found in article 15 can only mean "practices in regard to letters rogatory."

The State Department's comments on article 15 also support this construction, for they state expressly that article 15 permits "the continuance of practices between states *concerning letters rogatory.*"[38] As this case involves the question whether methods of service *other than* letters rogatory are preempted by the Convention, reliance on article 15 is misplaced: That article simply has nothing to say about any methods of serving process other than letters rogatory.

Kreimerman et al., for their part, point to article 17 of the Convention, which permits a "State of destination [to] refuse to execute a letter rogatory that is manifestly contrary to its public policy."[39] Interpreting a somewhat similar escape clause in the

---

[38]Treaty Doc. 98-27, viii (emphasis added).

[39]The Convention, art. 17.

16

Hague Evidence Convention,[40] the Supreme Court proclaimed its unwillingness, "[i]n the absence of explicit textual support, ... to accept the hypothesis that the common-law contracting states abjured recourse to all pre-existing discovery procedures at the same time that they accepted the possibility that a contracting party could unilaterally abrogate even the Convention's procedures."[41] The same could be said in this case: In the absence of explicit textual support we should be similarly chary before accepting that the United States abjured recourse to all other methods of service when other contracting States can unilaterally refuse to execute letters rogatory that are contrary to their public policies.

Thus, the text of the Convention strongly indicates, not that the Convention preempts other conceivable methods of service, but that it merely provides a mechanism for transmitting and delivering letters rogatory when and if parties elect to use that mechanism.

b. *Non-Textual or Extraneous Arguments*

Veerkamp et al. also advance several non-textual arguments in support of their assertion that the Convention preempts other methods of service. First, they point to President Reagan's Letter of Transmittal to the Senate, and the State Department's Letter of Submittal to the President, both of which opine that the Convention

---

[40]Hague Evidence Convention, art. 23 (which allows a contracting party to withhold its consent to the convention's procedures for pretrial discovery).

[41]*Societe Nationale Industrielle Aerospatiale,* 482 U.S. at 537, 107 S.Ct. at 2552.

and Additional Protocol "establish a treaty-based system of judicial assistance *analogous* to that which exists" among the States that are parties to the Hague Service Convention.[42]  But we do not see how this helps the defendants.  "Analogous" means "similar in certain respects,"[43] or "bearing some resemblance or likeness that permits one to draw an analogy."[44]  Inherent in these definitions is the connotation that analogous things are also "dissimilar" or "unlike" in certain respects, for if they were not they would be identical, or at least essentially identical, and not merely analogous.  Thus, even taken literally, these statements merely beg the question "similar in what way."  More likely, President Reagan and the State Department were simply referring to the most similar, already-existing treaty—the Hague Service Convention—without intending to make any legal judgments about the relative scopes of the two conventions.

Veerkamp et al. are also rather selective in drawing from these extrinsic sources.  For example, they are careful not to refer us to the portion of the President's Letter of Transmittal in which he indicates, not that United States courts *must* resort to Convention procedures [mandatory], but that the courts "*will be able to* avail themselves of" such procedures (permissive).[45]

---

[42]Treaty Doc. 98-27, p. i, iii (emphasis added).

[43]*Oxford American Dictionary* 28 (Oxford Univ. Press, Avon Books 1986).

[44]*Black's Law Dictionary* 84 (6th Ed.1990).

[45]Treaty Doc. 98-27, p. i (emphasis added).

18

Neither do they note President Reagan's opinion that "the purpose of the Convention is [merely] to *facilitate* service ... of documents."[46] Similarly, Veerkamp et al. fail to call our attention to the State Department's assertion that "[t]he Convention, together with the Additional Protocol, establishes *a* mechanism [not *the* mechanism] for service of process" among the contracting States.[47] In view of the importance that the Supreme Court places on such permissive language,[48] Veerkamp et al.'s selective use of these extrinsic sources is understandable, albeit not altogether forthcoming. Taken as a whole, references to these extrinsic sources do not strengthen Veerkamp et al.'s position: Indeed, their net effect is to weaken it.

Veerkamp et al. also suggest that Kreimerman et al.'s construction of the Convention—which makes resort to the Convention procedures optional rather than mandatory—renders the Convention inefficacious: Contracting States could simply choose to disregard Convention procedures when they proved inconvenient. The Supreme Court, however, has rejected this argument in a variety of

---

[46]*Id.* The Supreme Court attached considerable importance to precisely this sort of permissive language in holding that the Hague Evidence Convention did *not* preempt other pre-existing methods of discovery. *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 534, 107 S.Ct. 2542, 2550, 96 L.Ed.2d 461 (1987) (noting that the preamble to the convention stated that its purpose was to *facilitate* the transmission and execution of letters of request).

[47]*Id.* at iv (emphasis added).

[48]*See generally Societe Nationale Industrielle Aerospatiale,* 482 U.S. 522, 107 S.Ct. 2542.

contexts.  In *Societe Nationale Industrielle Aerospatiale,* for example, the Court concluded that it is enough that the Hague Evidence Convention "procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention."[49]  Similarly, in *United States v. Alvarez-Machain,* the Supreme Court concluded that the 1978 Extradition Treaty between the United States and Mexico was not the exclusive means for the United States to gain custody over suspects residing in Mexico.[50] In so concluding, the Court rejected the argument—advanced by the dissent—that the purposes of the extradition treaty "would be utterly frustrated" if other means of gaining custody over foreign suspects were permitted.[51]  The Supreme Court has thus clearly rejected the argument that a treaty must be construed to preempt alternative, nontreaty-based procedures if the treaty is not to be rendered nugatory.

In *Schlunk,* the Supreme Court explained why the argument is unconvincing,[52] pointing out—albeit in a different context—that "nothing ... prevents compliance with the Convention even when the internal law of the forum does not so require."[53]  The Court also

---

[49]*Id.* at 541, 107 S.Ct. at 2554.

[50]*United States v. Alvarez-Machain,* 504 U.S. ----, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992).

[51]*Alvarez-Machain,* 504 U.S. at ----, 112 S.Ct. at 2198, 119 L.Ed.2d at 458.

[52]*Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 706, 108 S.Ct. 2104, 2111, 100 L.Ed.2d 722 (1988).

[53]*Id.,* 486 U.S. at 706, 108 S.Ct. at 2111.

20

observed that "[t]he Convention provides simple and certain means by which to serve process on a foreign national."[54]

These same observations apply perforce to this case. The Convention provides plaintiffs with a "safe harbor"—a dependable mechanism—but not necessarily the only lawful mechanism—by which they may effect service on defendants residing in another signatory nation. Plaintiffs who elect not to avail themselves of the Convention machinery assume the risk that other legal principles, like the principle of international comity, might hinder their establishment of jurisdiction over the defendants. Finally, Such plaintiffs may also discover that their failure to employ the Convention's safe harbor procedures makes enforcement of their judgments abroad more difficult or even impossible.[55]

When we thus consider all the arguments advanced by the parties—both textual and non-textual—we conclude that the Convention does not preempt other methods of service. This conclusion does not, however, guarantee the availability or efficacy of other methods of service, and we do not today decide which other methods of service—if any—would be supportable or efficacious under applicable domestic and international law.

3. *The Texas Long-Arm Statute*

Veerkamp et al. urge that considerations of comity require that we respect the traditional civil law requirement—apparently practiced in Mexico—that legal documents be served by a government

---

[54]*Id.*

[55]*Id.*

21

official or through other official channels.  Veerkamp et al. would have us affirm on other grounds the district court's decision to quash service:  specifically, by declaring that such service violates principles of comity.  Ignoring for a moment the failure by Veerkamp et al. to introduce any evidence concerning the laws of Mexico or any precedents explaining how principles of comity might apply here, this argument misconstrues the core issue of this case.

Although the parties apparently agree that Kreimerman et al. properly employed the machinery of the Texas Long-Arm Statute, they do not address—in their submissions to us or to the district court—whether service of process under the Texas Long-Arm Statute on defendants residing in Mexico contravenes notions of comity, the procedural requirements of Fed.R.Civ.P. 4, or any other applicable domestic or international laws.[56]  Neither did the district court reach such issues:  Its inquiry ended when it held—incorrectly, we conclude—that the Convention preempted all other methods of service

---

[56]The content of Federal Rule of Civil Procedure 4(f), formerly largely contained in Fed.R.Civ.P. 4(i), seems especially relevant to this analysis.  But again, the parties did not discuss whether Kreimerman's attempt to serve Veerkamp under the Texas Long-Arm Statute comports with Rule 4(f).

> Rule 4(f), rather than the former Rule 4(i), is the provision that the district court must analyze on remand because the 1993 amendments to the federal Rules of Civil Procedure took effect on December 1, 1993, and govern "all proceedings in civil cases thereafter commenced and, insofar as just and practicable, *all proceedings in civil cases then pending.*"  Order of the Supreme Court of the United States Adopting and Amending Rules, April 22, 1993;  *see also Burt v. Ware,* 14 F.3d 256, 258 (5th Cir.1994) (indicating that amendments to the Federal Rules of Appellate Procedure should be given retroactive application to the maximum extent possible).

on defendants residing in another signatory nation. Whether Kreimerman et al.'s attempt to serve process under the Texas Long-Arm Statute contravened any other law besides the Convention is thus not before us. Such considerations are for the district court on remand.[57]

B. *Other Issues*

Kreimerman et al. also raise several other issues, none of which warrants extensive treatment at this juncture.

1. *Removal to the Wrong Division*

A defendant who wants to remove a civil action from a state court to a federal district court must "file in the district court of the United States for the district and *division* within which such action is pending a notice of removal...."[58] In this case, the parties agree that the action should have been removed, not to the Houston Division, but to the McAllen Division of the Southern District of Texas. Relying on this error, Kreimerman et al. moved the district court to remand the case to state court, or, alternatively, to transfer the case to the McAllen Division. The court, however, denied the motion. Kreimerman et al. now insist that the court's denial constituted reversible error.

Citing *King v. Gulf Oil Co.,*[59] Veerkamp et al. suggest that we

---

[57]We leave it to the district court's discretion whether to hold additional hearings on these questions.

[58]28 U.S.C. § 1446(a).

[59]581 F.2d 1184, 1187 (5th Cir.1978) (reversal for failure to follow Fed.R.Civ.Pro. is warranted only if prejudice is demonstrated).

simply dismiss this defect in removal by invoking harmless error.[60] As removal statutes are strictly construed against removal,[61] though, we decline to take such a dismissive approach. Some courts have held that removal of a case to the wrong division of the right district nevertheless creates a jurisdictional defect, leaving the district court with no power to adjudicate the case and no choice but to remand.[62] Other courts have held that removal to the wrong division is procedural, not jurisdictional.[63] We agree with the later perspective.

Although Veerkamp et al. removed this case to the wrong division, there is no doubt that the district court had subject matter jurisdiction under 28 U.S.C. § 1332, given the parties' diversity of citizenship.[64] The existence of such jurisdiction makes this case much more akin to an improper venue situation than to one in which there is an actual jurisdictional defect.[65] The district court thus should have transferred the case to the McAllen division under the authority of 28 U.S.C. § 1406(a), which—in the interest of justice—allows a case to be transferred "to any

---

[60]Veerkamp et al. refer, of course, to 28 U.S.C. § 2111.

[61]*Brown v. Demco, Inc.,* 792 F.2d 478, 482 (5th Cir.1986); *Butler v. Polk,* 592 F.2d 1293, 1296 (5th Cir.1979).

[62]*See, e.g., Scarmardo v. Mooring,* 89 F.Supp. 936, 937 (S.D.Tex.1950).

[63]*Cook v. Shell Chemical Co.,* 730 F.Supp. 1381, 1382 (M.D.La.1990).

[64]*Id.; accord Mortensen v. Wheel Horse Prods., Inc.,* 772 F.Supp. 85, 89 (N.D.N.Y.1991).

[65]*Mortensen,* 772 F.Supp. at 89; *Cook,* 730 F.Supp. at 1382.

district or division in which it could have been brought."[66] As we are remanding the case to the district court anyway, we need not decide whether the court's refusal to transfer the case constituted reversible error: We simply remand the case to the Houston Division with directions to transfer the case to the McAllen Division under 28 U.S.C. § 1406(a).

## 2. *Motion to Extend*

Kreimerman et al. also complain that the magistrate judge erred in rejecting their third motion to extend the time within which to accomplish service of process. A district court, however, has broad discretion to dismiss an action for ineffective service of process,[67] so we review such a decision only for abuse of discretion.[68] Additionally, when the time to effect service has expired, the party attempting service has the burden of demonstrating "good cause" for failure to serve the opposing party.[69]

In this case, Kreimerman et al. did not move to extend service for the third time until more than a month after the expiration of the twice previously extended deadline for effecting service. Therefore, they had the burden of demonstrating that

---

[66]28 U.S.C. § 1406(a); *Mortensen,* 772 F.Supp. at 89; *Cook,* 730 F.Supp. at 1382.

[67]*George v. United States Dep't of Labor,* 788 F.2d 1115, 1116 (5th Cir.1986).

[68]*System Signs Supplies v. United States Dep't of Justice,* 903 F.2d 1011, 1013 (5th Cir.1990).

[69]*Winters v. Teledyne Movible Offshore, Inc.,* 776 F.2d 1304, 1305 (5th Cir.1985).

25

there was good cause for their failure to effect service. Attempting to satisfy that burden, Kreimerman et al. insist that their failure was through no fault of their own. We acknowledge that available evidence suggests that service of process takes considerably longer to accomplish in Mexico than it does in the United States.[70] We also realize that the Mexican attorney who was "helping" Kreimerman et al. serve process on the defendants apparently misrepresented even to Kreimerman that service had been accomplished. Unfortunately for Kreimerman et al., however, action or inaction that fall into the categories of inadvertence, mistake, or ignorance of counsel do not constitute excusable neglect.[71]

Kreimerman et al. selected and reposed their trust in the Mexican counsel, who in turn selected and worked with the other lawyer in Mexico City, who ultimately proved to be unreliable or dishonest, or both. That is at least vicariously Kreimerman et al.'s fault. Moreover, when Kreimerman et al. made their third motion to extend the time for service, they had already been given sixteen (16) months in which to serve the defendants, and the magistrate judge found that there was no reason to believe that service would have been effected in the near future. The translation of legal documents into Spanish, for example, took six

---

[70]If it is true that it takes considerably longer to effect service of process in Mexico than in the United States, then this is yet another reason to hold that the Convention does not foreclose other methods of service: If the machinery provided by the Convention does not work very well, we should be loathe to condemn United States residents to use such an ineffective apparatus.

[71]*McGinnis v. Shalala,* 2 F.3d 548, 551 (5th Cir.1993).

months, and Kreimerman et al.'s Mexican counsel suggested that those translations were still inadequate. Even if we were to assume that the misrepresentations by the Mexican counsel constituted good cause for failing to effect service, we would conclude that Kreimerman et al. did not show good cause for failure to take any action during the eight months preceding those misrepresentations. Neither did Kreimerman et al. explain why the whole process was not further along after nearly two years. Under these facts, we cannot say that the district court abused its discretion.

3. *Adoption of Magistrate Judge's Recommendations*

Kreimerman et al. also suggest that the district court did not make a *de novo* review of the magistrate judge's Memorandum and Recommendations. They complain that the district court erred in adopting the magistrate judge's recommendations before they had filed their written objections. Kreimerman et al. assert, in essence, that because the district court did not wait for them to file their objections, and because the court did not clarify the magistrate judge's ruling with respect to the tolling of the applicable statute of limitations (and other rulings), we cannot be certain that the district court made a proper *de novo* review.

We grant that a district court must make a *de novo* review whenever a magistrate judge recommends dismissal.[72] Indeed, even when no objections are made to the magistrate judge's memorandum

---

[72]*Longmire v. Guste,* 921 F.2d 620, 623 (5th Cir.1991); *United States v. Wilson,* 864 F.2d 1219, 1221 (5th Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989).

and recommendations, the district court is obligated to undertake an independent review of the case.[73]  In this instance, however, Kreimerman et al. do little more than speculate that the district court *may* not have made a *de novo* review of the instant case.  They advance neither evidence nor specific factual allegations in support of their prayer for reversal.  Under these sparse circumstances, we are most reluctant to find that the district court failed to engage in a proper review.[74]

Neither are we troubled by the district court's adoption of the magistrate judge's recommendations prior to the court's receipt of Kreimerman et al.'s timely-filed written objections.  Kreimerman et al. cite no cases which hold that a district court's failure to wait until objections are filed before adopting a magistrate judge's recommendations constitutes reversible error.[75]  Moreover, even if the district court had erred in its attempt to follow the Federal Rules of Civil Procedure, we would not be forced to reverse in the absence of prejudice.[76]  Additionally, Kreimerman et al.'s two motions for reconsideration gave the district court opportunity

---

[73]*Equitable Life Assur. Soc. v. Mangel Stores Corp.,* 691 F.Supp. 987, 989 (E.D.La.1988).

[74]*Longmire,* 921 F.2d at 623.

[75]Kreimerman does cite *Nalty v. Nalty Tree Farm,* 654 F.Supp. 1315 (D.Ala.1987), but that case merely established the method for computing the time period for filing objections:  it says nothing about whether a district court must wait for those objections to be filed before adopting a magistrate's recommendations.

[76]*See, e.g., King v. Gulf Oil Co.,* 581 F.2d 1184, 1187 (5th Cir.1978) (court failed to hold hearing on class certification).

to consider—yet again—their objections.  We discern no reason to believe that the district court did not do its job properly.

III

CONCLUSION

After analyzing all the arguments advanced by each side, we conclude that the Convention does not preempt every other conceivable method of serving process on defendants residing in other signatory states.  This conclusion does not necessarily imply the existence and availability of other methods of service that would be supportable and effective under domestic and international law.  We simply hold that the Inter-American Convention on Letters Rogatory does not foreclose other methods of service among parties residing in different signatory nations, if otherwise proper and efficacious.  We therefore remand the case to the district court with instructions to consider whether the only other method of service of process attempted by the plaintiffs—service under the Texas Long-Arm Statute—comports with principles of comity, Fed.R.Civ.P. 4 (especially 4(f)), and any other applicable legal principles of domestic or international law.  Because the case was originally remanded to the wrong division of the United States District Court for the Southern District of Texas, however, we remand the case to the Houston Division with directions to transfer it to the McAllen Division, pursuant to 28 U.S.C. § 1406(a).  The McAllen Division will then determine whether Kreimerman et al.'s attempt to serve the defendants under the Texas Long-Arm Statute contravened any applicable laws or legal principles.

29

In connection with our instructions to the McAllen Division of the United States District Court for the Southern District of Texas, we emphasize that nothing in this opinion should be construed as authorizing Kreimerman et al. to institute any new or additional efforts to serve the defendants:  The district court need only determine whether Kreimerman et al.'s previous efforts to serve process under the Texas Long-Arm Statute were consistent with applicable legal principles—international and domestic.

Therefore, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED to the Houston Division of the United States District Court for the Southern District of Texas, with instructions to transfer the case under 28 U.S.C. § 1406(a) to the McAllen Division for further proceedings consistent with this opinion.