Mario Alonso MARQUEZ–RAMOS,
Plaintiff–Appellant,

v.

Janet RENO, Attorney General of
the United States, Defendant–
Appellee.

No. 95–1045.

United States Court of Appeals,
Tenth Circuit.

Nov. 2, 1995.

Submitted on the briefs:

Charles F. Benninghoff III, of Benninghoff & Ramirez, San Juan Capistrano, California, for Plaintiff–Appellant.

Henry L. Solano, United States Attorney, Richard C. Kaufman, Assistant U.S. Attorney, Denver, Colorado, for Defendant–Appellee.

Before BALDOCK, HOLLOWAY, and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Mario Alonso Marquez–Ramos appeals the district court's order granting the Attorney General's motion to dismiss his complaint for writ of mandamus filed pursuant to 28 U.S.C. § 1361.[1] Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.[2]

Mr. Marquez–Ramos is a Mexican national currently incarcerated in the federal prison in Florence, Colorado. In 1991, he pleaded guilty to conspiracy to possess with intent to distribute and distribution of marijuana and

was sentenced to a prison term of 144 months. While serving his sentence, he was convicted of conspiracy to escape and was sentenced to an additional eighteen months. In July 1992, he filed a petition with the Attorney General requesting that he be transferred to a Mexican prison pursuant to the Treaty on the Execution of Penal Sentences, November 25, 1976, U.S.–Mexico, T.I.A.S. No. 8718 ("Treaty"), and its implementing legislation, the Transfer of Offenders to and from Foreign Countries Act, 18 U.S.C. §§ 4100 to 4115 ("Act"). On February 15, 1994, "after considering all appropriate factors," the Attorney General denied the transfer on the basis of "the seriousness of the offense and prisoner's significant ties to the United States." Appellant's App. at 33.

Mr. Marquez–Ramos then filed this action seeking a writ of mandamus directing the Attorney General to transfer him to a Mexican prison pursuant to the Treaty. The matter was referred to a magistrate judge, and the Attorney General responded with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The magistrate judge recommended that the motion be granted on the basis that the Attorney General had discretion in deciding whether to transfer a prisoner, and that mandamus relief was not available to challenge the exercise of the Attorney General's discretion. After considering Mr. Marquez–Ramos's objections, the district court adopted the magistrate judge's recommendation, granted the Attorney General's motion, and dismissed the case with prejudice. On appeal, relying on the legislative history behind the Act, Mr. Marquez–Ramos argues that the Attorney General owes him a "nondiscretionary ministerial duty to grant his transfer request," Appellant's Br. at 18, and that he is therefore entitled to mandamus relief.

■ "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff

---

1. Section 1361 provides: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

2. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App. P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616, 104 S.Ct. 2013, 2022, 80 L.Ed.2d 622 (1984) (citing *Kerr v. United States Dist. Court*, 426 U.S. 394, 402–03, 96 S.Ct. 2119, 2123–24, 48 L.Ed.2d 725 (1976)); *see also Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir.1991) ("Mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, ministerial duty."). The importance of the term "nondiscretionary" cannot be overstated—the judiciary cannot infringe on decision-making left to the Executive branch's prerogative. The "ministerial-discretionary dichotomy which permeates the jurisprudence of mandamus is merely shorthand for the well-taken rule that to the extent a statute vests discretion in a public official, his exercise of that discretion should not be controlled by the judiciary." *Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419 v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981) (footnote omitted); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170–71, 2 L.Ed. 60 (1803); *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 44, 48, 9 S.Ct. 12, 13, 14, 32 L.Ed. 354 (1888). Thus, the question of whether a particular act is discretionary or ministerial rises to the jurisdictional level. *Carpet, Linoleum & Resilient Tile Layers*, 656 F.2d at 567.[3]

■ To determine whether the acts at issue are discretionary and therefore susceptible to mandamus relief, a court must measure the allegations in the complaint against the statutory, constitutional, and in this case, treaty framework to determine

> whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators.... In other words, even in

an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated.

*Id.* at 566 (quotation omitted).

■ Moreover, once a party seeking issuance of a writ of mandamus meets its burden of showing the prerequisites have been met, a court still exercises its own discretion in deciding whether or not to issue the writ. *See Marathon Oil*, 937 F.2d at 500; *see also Kerr*, 426 U.S. at 403, 96 S.Ct. at 2124 ("[I]ssuance of the writ is in large part a matter of discretion with the court to which the petition is addressed."); *13th Regional Corp. v. United States Dep't of Interior*, 654 F.2d 758, 762–63 (D.C.Cir.1980) (exercising discretion to deny writ where petitioner delayed four years in seeking it). Because ultimately, issuance of the writ is left to the district court's discretion, we review a district court's denial of mandamus for an abuse of that discretion, *see Marathon Oil*, 937 F.2d at 500; *Franchi v. Manbeck*, 972 F.2d 1283, 1289 (Fed.Cir.1992); however, we consider de novo whether the legal prerequisites for such relief are present, *see Azurin v. Von Raab*, 803 F.2d 993, 995 (9th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3264, 97 L.Ed.2d 763 (1987); *see also Marathon Oil*, 937 F.2d at 500 (court exercises discretion to issue writ " '[o]nce the [prerequisite] conditions are satisfied' ") (quoting *DeMasi v. Weiss*, 669 F.2d 114, 117 (3d Cir.1982)). Because the district court found the conditions for issuing the writ were not satisfied and did not exercise its discretion, our review here is de novo.

■ Turning to Mr. Marquez–Ramos's contentions, his argument that the Attorney

---

**3.** Though the district court dismissed the complaint on the Attorney General's motion to dismiss under Rule 12(b)(6), it performed the same analysis as would be required in looking at the question as a jurisdictional issue. In considering a motion to dismiss for failure to state a claim, "a court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Mascheroni v. Board of Regents*, 28 F.3d 1554,

1560 (10th Cir.1994) (quotation omitted). Similarly, "[i]n resolving whether section 1361 jurisdiction is present, allegations of the complaint, unless patently frivolous, are taken as true to avoid tackling the merits under the ruse of assessing jurisdiction.... The test for jurisdiction is whether mandamus would be an appropriate means of relief." *Carpet, Linoleum & Resilient Tile Layers*, 656 F.2d at 567 (quotation and citations omitted).

General's duty to transfer him is nondiscretionary is not based on the Treaty itself, but rather on the legislative history behind the Act. *Cf. Carpet, Linoleum & Resilient Tile Layers,* 656 F.2d at 566 (noting potential relevance of legislative materials). However, in interpreting a treaty, we do not look first to the legislative history of its implementing act. Rather, as would be expected, we start " 'with the text of the treaty and the context in which the written words are used.' " *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988) (further quotations omitted)); *see also Kreimerman v. Casa Veerkamp, S.A. de C.V.,* 22 F.3d 634, 638 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 577, 130 L.Ed.2d 492 (1994). Where the text is clear, we interpret it as written. *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134, 109 S.Ct. 1676, 1683, 104 L.Ed.2d 113 (1989) (rejecting use of drafting history in elucidating unambiguous treaty).

"[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty."

*Id.* at 135, 109 S.Ct. at 1684 (quoting *In re The Amiable Isabella,* 19 U.S. (6 Wheat.) 1, 71, 5 L.Ed. 191 (1821)). Should the language of a treaty prove to be unclear or ambiguous, " 'we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.' " *Eastern Airlines,* 499 U.S. at 535, 111 S.Ct. at 1493 (quoting *Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985) (quoting *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943))).

■ We thus look first to the language of the Treaty, which, in this instance, is as far as we need to go. Article IV delineates the procedures for initiating an international transfer of a prisoner. Section (2) states that "[i]f the Authority of the Transferring State finds the transfer of an offender appropriate, and if the offender gives his express consent for his transfer, said Authority shall transmit a request for transfer, through diplomatic channels, to the Authority of the Receiving State." [4] Thus, by its own terms, the first clause of this section sets forth a necessary precondition to a prisoner transfer under the Treaty—whether the Attorney General finds a transfer "appropriate." Article IV, section (4) of the Treaty provides criteria for determining the appropriateness of a transfer:

In deciding upon the transfer of an offender the Authority of each Party shall bear in mind all factors bearing upon the probability that the transfer will contribute to the social rehabilitation of the offender, including the nature and severity of his offense and his previous criminal record, if any, his medical condition, the strength of his connections by residence, presence in the territory, family relations and otherwise to the social life of the Transferring State and the Receiving State.

Contrary to Mr. Marquez–Ramos's assertions, these sections of the Treaty vest the Executive branch, in particular, the Attorney General, with discretion to decide whether to transfer a prisoner. Section (2) requires the Attorney General to transmit a request for transfer only "if" she finds the transfer "appropriate." In making this finding, section (4) requires her to "bear in mind" a variety of competing factors affecting both the rehabilitation of the offender and the social life of the two countries. This language clearly makes transfer decisions discretionary. Moreover, the particular context in which transfer decisions are made cannot be ignored; such determinations have international and political ramifications that cannot be relegated to mere ministerial actions. We therefore conclude that the Treaty on its face

---

4. Pursuant to Article III of the Treaty, the United States has designated the Attorney General as the "Authority" empowered to act on behalf of the United States. 18 U.S.C. § 4102(1). The Attorney General may further delegate this authority to officers of the Department of Justice. *Id.* § 4102(11).

makes the decision whether to transfer a prisoner a discretionary one.[5]

Even if we were to consider the extraneous materials Mr. Marquez–Ramos contends are relevant, our conclusion would remain the same. We note first that the materials he relies on do not reflect the "history of the treaty, the negotiations, and the practical construction adopted by the parties," *Eastern Airlines*, 499 U.S. at 535, 111 S.Ct. at 1493. In fact, he provides no materials relevant to the drafting, negotiating, or practical construction of the Treaty itself. He cites only Congressional reports and statements related to the Act, despite the fact that nothing in the Act gives any indication the Attorney General's decision is nondiscretionary. *See* note 5, *supra.* These materials at most provide background on the United States perspective, but not the Mexican perspective. Moreover, they reflect generally the salutary rehabilitative and humanitarian goals of the Treaty without addressing the discretionary-ministerial issue of specific concern here.

Where the issue is addressed, it is clear the intent was to provide the Attorney General with discretion in making the decision.[6]

 The record indicates, and Mr. Marquez–Ramos does not contest, that the Attorney General undertook a discretionary assessment of whether Mr. Marquez–Ramos should be transferred and determined that he should not. Mr. Marquez–Ramos disagrees with the Attorney General's exercise of her discretion, but that is not our concern here. As long as the Attorney General had the discretion, which she did, and exercised it within the framework of the Treaty, which she also did, Mr. Marquez–Ramos is not entitled to mandamus relief.

AFFIRMED.

**5.** Mr. Marquez–Ramos does not argue that any part of the Act makes the Attorney General's decision nondiscretionary. He does argue strenuously in his reply brief that two cases the Attorney General cites, *Bagguley v. Bush*, 953 F.2d 660 (D.C.Cir.1991), *cert. denied*, 503 U.S. 995, 112 S.Ct. 1698, 118 L.Ed.2d 408 (1992) and *Scalise v. Thornburgh*, 891 F.2d 640 (7th Cir. 1989), 112 S.Ct. 1698, 118 L.Ed.2d 408 *cert. denied*, 494 U.S. 1083, 110 S.Ct. 1815, 108 L.Ed.2d 945 (1990), are irrelevant because they do not interpret the Treaty. Both cases involve the Convention on the Transfer of Sentenced Persons, March 21, 1983, T.I.A.S. No. 10,824. Regardless of the relevance of these cases' interpretation of the Convention to interpretation of the Mexican Treaty, both cases did interpret the Act and concluded that it placed transfer decisions within the Attorney General's discretion. *Bagguley*, 953 F.2d at 662 ("[T]he Act and the [Convention] give the Attorney General unfettered discretion with respect to transfer decisions...."); *Scalise*, 891 F.2d at 645 ("The Act ... does not ... provide substantive guidelines by which the Attorney General should exercise his discretion.... [T]his discretion which Congress has bestowed upon the Attorney General in carrying out his duties under the Act is reasonable in light of the unique nature of prisoner transfer decisions.").

**6.** The primary piece of legislative history on which Mr. Marquez–Ramos relies states as follows:

Under existing treaties and this legislation, the Attorney General must agree to the receipt or transfer of an offender. The committee was concerned that the Attorney General exercise his discretion on this consent with care. In most cases, and possibly almost all cases, he should agree to any receipt or transfer, if the offender requests or voluntarily consents to such transfer. However, there may be an unusual situation, involving possibly a dangerous offender, where the Attorney General should not agree to the return of the offender, and his immediate eligibility for parole, to the United States. Similarly, there may be an unusual situation, involving an individual in American [prison], who for matters of future law enforcement, continuing investigation, or other national interests, should not be sent to his home country. The committee therefore expects the Attorney General to promptly establish regulations and to provide standards and guidelines which will govern the exercise of his discretion as to his consent to receive or transfer offenders.

H.Rep. No. 95–720, 95th Cong., 1st Sess., 32 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3155.

Similarly, the Attorney General's letter transmitting the proposed legislation to the House committee states that "[t]he decision to transfer would be made on the basis of the whole record of the offender and the authorities' estimate as to the likelihood that the transfer would be beneficial." Letter from Attorney General Griffin B. Bell to the Speaker of the House of Representatives (April 28, 1977), *id.* at 3169.