**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 4/29/96**

**TENTH CIRCUIT**

_____

| | |
|---|---|
| ARTHUR C. KASS, | ) |
| | ) |
| Petitioner-Appellant, | ) |
| | ) |
| v. | )  No. 95-3190 |
| | ) |
| JANET RENO, Attorney General of the | ) |
| United States of America, and GARY L. | ) |
| HENMAN, Warden, | ) |
| | ) |
| Respondents-Appellees. | ) |

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 92-CV-3109)**

_____

Submitted on the briefs:[*]

David J. Phillips, Federal Public Defender, and Charles D. Dedmon, Assistant Federal Public Defender, Topeka, Kansas, on the briefs for Petitioner-Appellant.

Randall K. Rathbun, United States Attorney, and Melanie D. Caro, Assistant United States Attorney, on the briefs for Respondents-Appellees.

_____

Before **BRORBY**, **EBEL** and **HENRY**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. _See_ Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Arthur Cyrus Kass, an inmate at the United States Penitentiary in Leavenworth, Kansas, appeals the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. We have jurisdiction under 28 U.S.C. §§ 1291 & 2253 and we affirm.

**I**

In 1984, a state court in Jalisco, Mexico, convicted Mr. Kass of homicide and robbery and sentenced him to twenty-three years imprisonment and a fine of approximately 700,000 pesos. On April 12, 1989, Mr. Kass was officially transferred to the custody of the United States Bureau of Prisons to serve the remainder of his sentence, pursuant to the Treaty Between the United States of America and the United Mexican States on the Execution of Penal Sentences, Nov. 25, 1976, 28 U.S.T. 7399 (hereafter "the Treaty"), and its implementing legislation, the Transfer of Offenders to or from Foreign Countries Act, Pub.L.No. 95-144, 91 Stat. 1212 (codified at 10 U.S.C. § 955; 18 U.S.C. §§ 3244, 4100-4115). On the same day, Mr. Kass appeared at a verification hearing before a United States Magistrate in Ciudad Juarez, Chihuahua, Mexico. *See* 18 U.S.C. §§ 4108 and 4109. During the hearing, Mr. Kass waived his right to counsel, consented both to the transfer and to the conditions imposed by the Treaty and its implementing statutes, and acknowledged that his consent was both voluntary and irrevocable. Mr. Kass also signed a document that repeated his statements at the hearing. The document specifically provided Mr. Kass agreed his "conviction or sentence can only be modified or set aside through appropriate proceedings brought by me or on my behalf in the United Mexican States," and that his "sentence will be carried out according to the laws of the United States of America." Mr. Kass does not challenge the validity of the verification proceedings.

2

Because his offense occurred before November 1, 1987, Mr. Kass was eligible for parole at the discretion of the Parole Commission as soon as he arrived in the United States. 18 U.S.C. § 4106(c, d); 28 C.F.R. § 2.62(a)(1). The Parole Commission held a hearing in October 1989, denied parole, and continued his sentence to expiration. In its decision, the Parole Commission noted Mr. Kass had been convicted of murder and had attempted to escape from a Mexican prison. The Parole Commission set a statutory interim parole hearing for February 1992, but Mr. Kass waived that hearing. Mr. Kass's full term of imprisonment expires in October 2007, but with the inclusion of certain credits, his projected release date as of April 18, 1995, was December 31, 1996.

In March 1990, an employee at the Federal Correctional Institution in La Tuna, Texas, where Mr. Kass was then incarcerated, filed an incident report charging Mr. Kass with attempted escape from a secured institution and forging an official letter. The incident report alleged the following:

> At the conclusion of an investigation by the SIS, the fact has been established that you conspired with Michael Carrerra (who is incarcerated at a prison in Guadalajara, Mexico) to forge an official letter from a Mexican Prison Director, and this forgery was completed for the purposes of receiving a release/parole date from the U. S. Parole Commission. This conspiracy, therefore, was also an act to attempt an escape from custody, for the release date (if granted and the letter not detected by staff) would have been a date contrived of by unofficial means.

Mr. Kass later appeared at a hearing before a Disciplinary Hearing Officer (DHO). After the hearing, the DHO notified Mr. Kass in writing that he had found true the allegation of attempted escape. The notice identified the evidence the DHO relied upon in making his determination. Mr. Kass received fourteen days disciplinary segregation, forfeited two hundred days of good time, and the DHO recommended disciplinary transfer. Mr. Kass appealed, and the Bureau of Prisons directed the DHO to reopen his case and reconsider the evidence. The Bureau of Prisons reopened the case because

3

the evidence relied on, as documented in Section V of the DHO Report, does not support the finding. After careful review of the entire packet of information presented to the DHO, it is our determination that there is some evidence to show Mr. Kass planned to effect an early release by counterfeiting a document intended to prove he served 9 years in a Mexican prison. The evidence, however, needs to be explicitly written in Section V of the DHO Report.

The DHO issued an amended report in September 1990, describing the evidence in more detail, reaffirming the finding of attempted escape, and ordering identical sanctions. (Id.) The Bureau of Prisons restored Mr. Kass's two hundred days of good time credit in 1994 due to his subsequent good conduct.

Mr. Kass petitioned the United States District Court for the District of Kansas for a writ of habeas corpus in March 1992. He alleged he was entitled to be released because the appropriate Mexican authorities had granted him a "partial pardon" or, in the alternative, because they had modified his sentence in accordance with the early release provisions of Jalisco state law. Second, Mr. Kass asserted the Bureau of Prisons had failed to award him the proper amount of work credit for the time he spent incarcerated in Mexico. He also challenged his disciplinary proceeding. On cross-motions for summary judgment, the district court rejected Mr. Kass's contention he was entitled to be released on the grounds he had received a partial pardon or sentence modification. The district court held an evidentiary hearing on Mr. Kass's remaining claims. The district court later rejected the remaining claims in a written order and denied Mr. Kass's petition for a writ of habeas corpus. This appeal followed.

## II

Mr. Kass first contends the district court erred in rejecting his claim he should be released because he received a partial pardon from the appropriate Mexican authorities. As a threshold matter, we must determine whether the Treaty allows United States courts to exercise jurisdiction over Mr. Kass's claims. "[I]n interpreting a treaty, ... we start with the text of the treaty and the context in which the written words are used.... Where the text is clear, we interpret it as written." *Marquez-Ramos v. Reno*, 69 F.3d 477, 480 (10th Cir. 1995) (citations and internal quotation marks omitted). "Should the language of a treaty prove to be unclear or ambiguous, we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Id.* (citations and internal quotation marks omitted). Under no circumstances, however, may we "alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial," for to do so "would be, on our part, an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty." *In re The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821).

By its plain language, the Treaty bars United States courts from exercising jurisdiction over collateral attacks on Mexican convictions by offenders transferred from Mexico to the United States. It states in no uncertain terms that Mexico "shall have exclusive jurisdiction over any proceedings, regardless of their form, intended to challenge, modify or set aside sentences handed down by its courts." Treaty, art. VI, 28 U.S.T. at 7406; *see also* 18 U.S.C. § 3244(1) ("the country in which the offender was convicted shall have exclusive jurisdiction and competence over proceedings seeking to challenge, modify, or set aside convictions or sentences handed down by a court of such country").

This jurisdictional limitation is a proper exercise of both the treaty power, U.S. Const., Art. II, § 2, cl. 2; *Rosado v. Civiletti*, 621 F.2d 1179, 1193 (2d Cir.), *cert. denied*, 449 U.S. 859 (1980); *Mitchell v. United States*, 483 F. Supp. 291, 294 (E.D. Wis. 1980), and of Congress's authority to regulate the jurisdiction of the federal courts, U.S. Const., art. III; *Mitchell,* 483 F. Supp. at 294. The jurisdictional limitation also does not offend the United States Constitution by denying prisoners convicted in Mexico the opportunity to challenge their convictions and sentences in United States courts on the grounds their Mexican trial did not comply with the Bill of Rights. *Pfeifer v. United States Bureau of Prisons*, 615 F.2d 873, 875-76 (9th Cir.), *cert. denied*, 447 U.S. 908 (1980); *Mitchell,* 483 F. Supp. at 295. This is so because during the statutorily required pre-transfer hearing before the United States Magistrate, *see* 18 U.S.C. §§ 4108 & 4109, the offender consents to be bound by the terms of the Treaty, which consent, if voluntary and knowing, "is a constitutionally valid waiver of any constitutional rights he or she might have regarding his or her conviction." *Pfeifer*, 615 F.2d at 876*; see also Mitchell,* 483 F. Supp. at 294. Furthermore, "the requirement that an offender agree not to challenge his or her conviction in a United States court is not an unconstitutional condition" on a benefit, because the offender does not relinquish any vested rights by consenting to the terms of the Treaty. *Pfeifer,* 615 F.2d at 876. "Americans who are incarcerated in Mexican prisons ... have no right to relief from United States courts. Those who accept the opportunity presented by the Treaty lose nothing by consenting to limit themselves solely to Mexican remedies after the transfer." *Id.; see also Rosado*, 621 F.2d at 1192-1201.[1]

---

[1] The *Pfeifer*, *Rosado*, and *Mitchell* courts essentially confirmed what Congress had already determined. The House and Senate subcommittees in charge of the implementing legislation were initially concerned whether any constitutionally protected rights of the transferring offender would be taken away by the treaty provision granting the transferring country exclusive jurisdiction to entertain challenges to convictions and sentences rendered by its courts, and also whether the consent verification procedures set

6

The Treaty also reduces the likelihood Mexico will modify or set aside an offender's conviction or sentence after transfer by making transfer possible only if "no proceeding by way of appeal or of collateral attack upon the offender's conviction or sentence [is] pending in [Mexico] and that the prescribed time for appeal of the offender's conviction or sentence has expired."  Treaty, art. II, § 6, 28 U.S.T. at 7403; *see also* 18 U.S.C. § 4100(c) ("An offender shall not be transferred to or from the United States if a proceeding by way of appeal or of collateral attack upon the conviction or sentence be pending."); *Mitchell*, 483 F. Supp. at 295 (upholding constitutionality of art. II, § 6). Mexico does, however, "retain the power to pardon or grant amnesty to the offender and the [United States] shall, upon being advised of such pardon or amnesty release the offender."  Treaty, art. V, § 2, 28 U.S.T. at 7405; *see also* 18 U.S.C. § 4100(d).  Also, if Mexico exercises its exclusive power to "modify or set aside [a] sentence[] handed down by its courts," the United States "shall, upon being advised by [Mexico] of action affecting the sentence, take the appropriate action in accordance with such advice."  Treaty, art. VI, 28 U.S.T. at 7406; *see also* 18 U.S.C. § 4100(d).

In light of these provisions, we, like the district court, conclude that United States courts have jurisdiction over Mr. Kass's claim he is entitled to be released because he has received a "partial pardon" or "modification" of his sentence, and we also conclude these claims are cognizable under

forth in the implementing legislation adequately served as a waiver of those rights.  H.R. Rep. No. 720, 95th Cong., 1st Sess. 27 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3149.  The subcommittees held extensive hearings and heard testimony from a number of witnesses, including experts on constitutional law.  *Id.* at 26, 1977 U.S.C.C.A.N. at 3149.  "[A]ll of these experts agreed that the [jurisdictional] provisions did not constitute a suspension, or even a partial suspension, of the writ of habeas corpus and that the procedures established by the implementing legislation adequately protected both the offender's and the treaty nations' rights."  *Id.* at 27, 1977 U.S.C.C.A.N. at 3149-3150; *see also id.* at 41-42, 1977 U.S.C.C.A.N. at 3164-3165.

28 U.S.C. § 2241. If the appropriate Mexican authorities did indeed "partially pardon" Mr. Kass or modify his sentence, the United States was obligated to release him after receiving proper notice from those authorities. Treaty, art. VI, 28 U.S.T. at 7405-06; 18 U.S.C.§ 4100(d). Thus, assuming the "partial pardon" and/or the sentence modification were valid and Mexico gave the United States proper notice, the United States' failure to release Mr. Kass violated "the laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Indeed, it appears Congress foresaw the possibility of such challenges when it enacted the implementing legislation, and Congress made it clear that despite the provision barring United States courts from reviewing the validity of a foreign conviction or sentence, "a transferred offender may challenge in the [United States] ... the manner of the execution of his confinement" and "[a]ny challenge in the courts of the [United States], other than to the foreign conviction or sentence is not precluded by [the implementing statutes], or any treaty." H.R. Rep. No. 95-720, 95th Cong., 1st Sess. 43 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3165. We therefore address the merits of Mr. Kass's claim.

Mr. Kass relies on four documents, J/2567/89, A/27/90, DK/565/90, and DRS/1507/91, to support his contention the appropriate Mexican authorities issued him a partial pardon. After noting that the authenticity of these documents had been "the source of needless dispute and unnecessary delay in this case," the district court concluded "[t]here is sufficient support in the record for the court to accept and consider all four documents in deciding whether [Mr. Kass] is entitled to habeas corpus relief." We need not determine whether the district court's conclusion was correct, because even if the documents are authentic Mr. Kass is not entitled to habeas corpus relief. Document J/2567/89 is a letter from Pedro Serratos Valle, the General Director of the Center for Social

8

Readjustment No. 1 of the States of Jalisco, Mexico, addressed "TO WHOM IT MAY CONCERN," and dated September 27, 1989. In this letter, Mr. Valle states that he was in charge of the Mexican institution in which Mr. Kass was incarcerated from February to April 1989. According to Mr. Valle, Mr. Kass is entitled to certain sentence adjustments under Jalisco state law, provided he "observe[d] good conduct, participate[d] regularly in the educational activities organized within the establishment and develop[ed] other skills in order to effect Social Readjustment." Document A/27/90 is another letter from Mr. Valle, also addressed "TO WHOM IT MAY CONCERN," and dated January 5, 1990. Mr. Valle states Mr. Kass worked during his incarceration in Jalisco and received commendations for good conduct. He also states Mr. Kass was convicted of attempting to escape from a Jalisco prison, but that he "settled" the conviction by paying a substantial fine. Like Document J/2567/89, Document A/27/90 states Mr. Kass is entitled to certain work and good time credits under Jalisco state law. Document A/27/90 is the document the DHO found was forged. Document DG/565/90 is a letter from Mr. Valle to Doreen T. Soler, Consul at the American Embassy in Guadalajara, Jalisco, Mexico, dated May 22, 1990, in which Mr. Valle again states Mr. Kass is entitled to certain credits against his sentence under Jalisco state law. Finally, Document DRS/1507/91 is a letter from Saul Perez-Bracamontes, the Director General of Social Readjustment, addressed "TO WHOM IT MAY CONCERN," and dated October 4, 1991, stating "the minimum and necessary time has elapsed for [Mr. Kass] to receive the benefit of early release" under Jalisco state law.

We, like the district court, conclude these four documents do not support Mr. Kass's claim he received a partial pardon or sentence modification. Even if we assume for the sake of discussion

9

that the documents correctly state the law of the state of Jalisco, Mexico, they show only that Mr. Kass might have become eligible to receive certain work and good time credits against his sentence had he remained in Mexico, rather than volunteering for transfer to the United States. In Document J/2567/89, Mr. Valle explains that under Jalisco state law, Mr. Kass "would have the possibility to attain ... early release with partial reduction of sentence .... [a]fter 8 years 2 months 12 days from the date the sentence began to compute" October 3, 1984, and that other early release provisions might apply after Mr. Kass served longer periods of confinement. However, Mr. Kass accepted formal transfer to the United States on April 12, 1989, well before he had served eight years, two months, and twelve days of his sentence. Once he is transferred to the United States, "the completion of [an offender's] sentence shall be carried out according to the laws and procedures of the [United States], including the application of any provisions for reduction of the term of confinement by parole, conditional release or otherwise." Treaty, art. V, § 2, 28 U.S.T. at 7405; *see also* 18 U.S.C. § 4105(a) ("Except as provided elsewhere in this section, [an offender transferred to the United States] shall remain in the custody of the Attorney General under the same conditions and for the same period of time as an offender who had been committed to the custody of the Attorney General by a court of the United States for the period of time imposed by the sentencing court"). Therefore, as of April 12, 1989, the law of the United States, not the law of the state of Jalisco, Mexico, governed his accrual of work credits, good time credits, credit for time served, or other credits, and it is irrelevant that he might have obtained more favorable credits had he remained in Mexico. Mr. Kass forfeited the potential benefit he might have received under the law of Jalisco, Mexico, when he chose to transfer to the United States.

There is nothing novel about this conclusion. The court applied a similar analysis in *Hamilton v. United States*, 464 F. Supp. 210 (M.D. Fla. 1979). Mr. Hamilton, a Canadian citizen convicted in the United States, was transfered to Canada pursuant to the Treaty Between the United States of America and Canada on the Execution of Penal Sentences, 30 U.S.T. 6263 (Mar. 2, 1977), which is quite similar to the United States' Treaty with Mexico. *Hamilton,* 464 F. Supp. at 212. He contended he was entitled to certain good time and industrial good time credits and/or early release on parole under United States law. *Id.* The Court held that once Mr. Hamilton was transfered to Canada, the law of Canada governed his accrual of credits and his eligibility of early release, and because Mr. Hamilton's right to receive good time credit, industrial good time credit, and early release on parole under United States law was not vested, but was merely contingent or discretionary, at the time he was transfered to Canada, Canada was not required to give him the benefit of these laws for the time he served in Canada. *Id.* We believe it is immaterial that *Hamilton* involved a transfer from the United States rather than a transfer to the United States, given the reciprocal nature of the United States-Canada Treaty, and we also see no reason to distinguish *Hamilton* on the ground it construed the United States-Canada Treaty rather than the United States-Mexico Treaty, in light of the similarity between these two treaties.

The Ninth Circuit's decision in *Boyden v. Bell*, 631 F.2d 120 (9th Cir. 1980), *cert. denied*, 454 U.S. 1051 (1981), also supports our conclusion. Mr. Boyden was a United States Citizen convicted in Canada. *Id.* at 122. At the time of transfer, Mr. Boyden was entitled to 1,827 days of remission under Canadian law. *Id.* He contended, however, that he was entitled to all of the remission time he would have received under Canadian law had he served his entire sentence in

11

Canada, not merely the remission time attributable to the time he actually served in Canada. *Id.* at 122-23. The court held that once Mr. Boyden transfered to the United States, he was no longer entitled to the benefit of the Canadian laws governing remission, and was entitled only to those remission credits that were vested under Canadian law at the time of transfer. *Id.* at 123.

Mr. Kass also makes much of his Mexican "Journal Entry of Sentencing," which states Mr. Kass "is condemned to suffer in the social rehibilitation [sic] center, as sentenced, or in a place directed by the Executive Entity, the punishment of TWENTY THREE (23) YEARS IMPRISONMENT, with the condition that one fourth part is total of the duration in this case if the offender submit himself during his internment to a material work regimen and intellectual activities directed to achieve his readaptation to social life." Mr. Kass contends both the twenty-three-year term of imprisonment and the early release condition contained in the "Journal Entry of Sentencing," cannot be severed, and that both the term of imprisonment and the early release condition constitute his sentence. According to Mr. Kass, by failing to release him on the basis of the early release condition incorporated into his sentence, the Bureau of Prisons violated Article V, § 3, of the Treaty, which provides "[n]o sentence of confinement shall be enforced by the [United States] in such a way as to extend its duration beyond the date at which it would have terminated according to the sentence of the court of [Mexico]." The Fifth Circuit has held, and we agree, that the term "sentence of the court" includes only the sentence actually rendered by a Mexican court, and that it does not incorporate "administratively awarded credits for early release." *Powell v. United States Bureau of Prisons*, 695 F.2d 868, 871 (5th Cir.), *cert. denied,* 464 U.S. 832 (1983). Here, however, the early release condition was not an "administratively awarded credit[] for early release," but instead was

12

part of the original sentence imposed by the Mexican courts. We therefore distinguish *Powell* and accept Mr. Kass's premise that both the twenty-three-year term and the early release condition together are "the sentence of the court" in this case. Despite this conclusion, however, Mr. Kass is not entitled to relief. The sentence requires him to "submit himself during his internment to a material work regimen and intellectual activities directed to achieve his readaptation to social life" for one-fourth of his total term of imprisonment, five years, nine months. Mr. Kass had not satisfied this condition at the time he voluntarily transfered to the United States. By doing so, Mr. Kass forfeited the opportunity to take advantage of the early release condition incorporated into his sentence.

Finally, Mr. Kass contends the requirement that he forego his right to take advantage of the various early release opportunities when he volunteered to transfer to the United States amounted to an unconstitutional condition on a benefit. We reject this contention. "A constitutional question arises when a party is required to relinquish a *vested* right as a condition for obtaining a benefit." *Pfeifer*, 615 F.2d at 876 (citing *United States v. Jackson*, 390 U.S. 570 (1968)) (emphasis in the original; additional citations omitted). Although the Journal Entry of Sentencing and the law of the state of Jalisco, Mexico, may have afforded Mr. Kass the opportunity to obtain early release by meeting certain conditions, Mr. Kass chose to forego those opportunities by volunteering for transfer to the United States. Because he did not satisfy the conditions before doing so, any rights he might have obtained had he satisfied them remained unvested. Undaunted, Mr. Kass also relies on a line of cases addressing conditions on presidential pardons, including *Schick v. Reed*, 419 U.S. 256 (1974). In *Schick*, the Supreme Court considered whether the president could commute a defendant's

13

sentence from death to life imprisonment on the condition he would never be eligible for parole. The Court concluded the condition "does not offend the Constitution." *Id.* at 267. It noted that "[i]t would be a curious logic to allow a convicted person who petitions for mercy to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily assumed in accepting the commutation which he sought." *Id.* We find Mr. Kass's logic equally curious in this case. Mr. Kass sought and obtained a significant benefit by volunteering for transfer to the United States, despite the fact his decision meant he sacrificed the opportunity for early release under the Journal Entry of Sentencing and Jalisco state law. He must now accept the consequences of his choice.

For the reasons stated, we reject Mr. Kass's contention he received a partial pardon from the appropriate Mexican authorities. We also reject his alternate contention he is entitled to the benefit of the early release provisions of the Journal Entry of Sentencing and of the law of the state of Jalisco, Mexico.

## III

Mr. Kass also contends the Bureau of Prisons failed to award him certain work credits he earned while incarcerated in Mexico. According to Mr. Kass, these work credits are entirely different than the early release provisions discussed in part II of this opinion, and were vested at the time of his transfer. The Treaty requires Mexico to "furnish the [United States] a statement showing the offense of which the offender was convicted, the duration of the sentence, the length of time already served by the prisoner and any credits to which the offender is entitled, such as, but not limited to, work done, good behavior or pretrial confinement." Treaty, art. IV, § 7, 28 U.S.T. at

14

7404. The relevant implementing statutes provide "[t]he transferred offender shall be entitled to all credits for good time, for labor, or any other credit toward the service of the sentence which had been given by [Mexico] for time served as of the time of the transfer," 18 U.S.C. § 4105(c)(1), and for "any days, prior to the date of the commencement of the sentence, spent in custody in connection with the offense or acts for which the sentence was imposed," 18 U.S.C. § 4105(b).[2] The Bureau of Prisons has the authority "to render to foreign countries and to receive from them certifications and reports required under a treaty," 28 C.F.R. § 0.96b, and is responsible for the proper application of foreign credits. *Trevino-Casares v. United States Parole Comm'n*, 992 F.2d 1068, 1070 (10th Cir. 1993); *see also Asare v. United States Parole Comm'n*, 2 F.3d 540, 543-44 (4th Cir. 1993); *Ajala v. United States Parole Comm'n*, 997 F.2d 651, 654-56 (9th Cir. 1993).

During the hearing on Mr. Kass's petition, the district court heard expert testimony regarding how the Bureau of Prisons calculates transferred offenders' sentences. The expert explained that prior to transfer, the Mexican Secretary of State prepares a "sentencia," also referred to as a Form CG-1A. The "sentencia" contains personal information about the offender, his offense, his sentence, and, most importantly, the credits he earned during his incarceration in Mexico. It is comparable to a presentence report. The "sentencia" is the only document the Bureau of Prisons uses to calculate the transfered offender's sentence, credits, and release date. Mr. Kass's "sentencia" states he performed 1,597 days of work, and is therefore qualified to 799 days of work credit, or one day of credit for every two days of work.

---

[2] Because Mr. Kass's offense occurred in 1984, we apply the version of 18 U.S.C. § 4105 in effect prior to November 1, 1987.

15

According to Mr. Kass, the one-for-two formula is derived from Mexican federal law, not Jalisco state law. Mr. Kass relies on paragraph 3 of Document A/27/90, the letter from Mr. Valle, dated January 5, 1990, for the proposition he is entitled to three days of work credit for every day of work under Jalisco state law, and contends that because he was convicted in a Jalisco state court, Jalisco law, not Mexican federal law, governs the computation of the work credits he earned while incarcerated in Mexico. Thus, Mr. Kass contends he has been deprived of a substantial number of work credits due to the Mexican State Department's and the Bureau of Prisons' erroneous reliance on Mexican federal law.

Neither the parties nor the district court considered whether United States courts have jurisdiction to reach the merits of Mr. Kass's contention. "It is well-settled that this court has an independent duty to inquire into its jurisdiction over a dispute, even where neither party contests it and the parties are prepared to concede it." *In re American Ready Mix, Inc.*, 14 F.3d 1497, 1499 (10th Cir.), *cert. denied*, 115 S.Ct. 77 (1994). We must also determine whether Mr. Kass's claim is cognizable in a proceeding under 28 U.S.C. § 2241, as a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Our reading of the record leads us to conclude the Bureau of Prisons complied with both the Treaty and its implementing statutes. By preparing and sending the "sentencia," Mexico "furnish[ed] the [United States] a statement showing the offense of which the offender was convicted, the duration of the sentence, the length of time already served by the prisoner and any credits to which the offender is entitled, such as, but not limited to, work done, good behavior or pretrial confinement." Treaty, art. IV, § 7, 28 U.S.T. at 7404. Because the "sentencia" provided all the necessary information, the Bureau of Prisons did not

16

"request additional information," which the Treaty authorizes if the United States "considers that the documents supplied by [Mexico] do not enable [the United States] to implement th[e] Treaty." Treaty, art. IV, § 8, 28 U.S.T. at 7405. The Bureau of Prisons relied on the information contained in the "sentencia" and awarded Mr. Kass "all credits for good time, for labor, or any other credit toward the service of the sentence which had been given by [Mexico] for time served as of the time of the transfer," 18 U.S.C. § 4105(c)(1), and credit for "any days, prior to the date of commencement of the sentence, spent in custody in connection with the offense or acts for which the sentence was imposed," 18 U.S.C. § 4105(b), as those credits were reflected therein.

Mr. Kass's real quarrel is with the Mexican Secretary of State, who, according to Mr. Kass, erroneously applied Mexican federal law rather than Jalisco state law in calculating the work credits reported in his "sentencia." The Treaty provides Mexico "shall have exclusive jurisdiction over any proceedings, regardless of their form, intended to challenge, modify or set aside sentences handed down by its courts." Treaty, art. VI, 28 U.S.T. at 7406; *see also* 18 U.S.C. § 3244(1) ("the country in which the offender was convicted shall have exclusive jurisdiction and competence over proceedings seeking to challenge, modify, or set aside convictions or sentences handed down by a court of such country"). Thus, if Mr. Kass's claim amounts to a "proceeding[] ... intended to challenge, modify or set aside" his sentence, United States courts lack jurisdiction.

Article VI gives Mexico broad, exclusive jurisdiction over "any proceedings, regardless of their form." However, the proceedings must be "intended to challenge, modify or set aside sentences handed down by its courts." Arguably, the "sentencia" is not part of the "sentence handed down" by

17

Mexico's courts, but rather an administrative document, much like a presentence report. Indeed, the Fifth Circuit has held the phrase "sentence of the court" in Article V, § 5, of the Treaty, includes only the sentence actually rendered by a Mexican court, and that it does not incorporate administrative documents or findings. *Powell*, 695 F.2d at 871. Given the apparent conflict between the broad phrase "any proceedings, regardless of their form" and the limiting phrase "intended to challenge, modify or set aside sentences handed down by its courts," we conclude the Treaty is ambiguous. We therefore look to extrinsic sources to determine its meaning. *Marquez-Ramos*, 69 F.3d at 480.

Congress conducted extensive hearings regarding this jurisdictional limitation before it enacted 18 U.S.C. § 3244 (formerly 28 U.S.C. § 2256), the statute that implements Article VI of the Treaty. The House Report lists a number of reasons why the jurisdictional limitation is constitutionally valid and why Congress should enact it. The first reason listed in the Report is that

> it is important to note that these provisions were considered essential in protecting the integrity of the judicial process of the respective countries and in securing approval for prisoner exchange treaties, in the past and presumably in the future. The Departments of Justice and State indicated that neither the United States nor any other country which is currently a party or expected to become a party to a treaty for the execution of penal sentences would have acquiesced to a provision which would permit the courts of the Receiving State to set aside or modify a sentence imposed by the courts of the Transferring State. Otherwise the fundamental sovereignty of a nation over crimes committed within its territorial boundaries would be impugned.

H.R. Rep. No. 720, 95th Cong., 1st Sess. 27 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3164-65. We share Congress's, the State Department's, and the Department of Justice's concern that foreign countries might be reluctant to enter into prisoner exchange treaties with the United States without ample assurance that United States courts would not become involved in their internal affairs.

18

Because of the political repercussions that might flow from our interpretation of Article VI of the Treaty, "'we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'" *Rosado*, 621 F.2d at 1200 (quoting *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 383 (1959)). There also can be little doubt that United States courts will face a great many other political and practical difficulties in resolving challenges to the Mexican Secretary of State's conclusions in the "sentencia." *See* Note, *Constitutional Problems in the Execution of Foreign Penal Sentences: The Mexican-American Prisoner Transfer Treaty*, 90 Harv. L. Rev. 1500, 1518-1522 (1977). In light of these concerns, we interpret Mexico's broad, exclusive jurisdiction over "any proceedings, regardless of their form, intended to challenge, modify or set aside sentences handed down by its courts" as including both challenges to the actual conviction and sentence rendered by the Mexican courts and challenges to the Mexican Secretary of States' application of Mexican law in the "sentencia."

Were we to conclude we had jurisdiction to resolve challenges to a transferred offender's "sentencia," we would be forced to resolve a number of issues which are better left to the appropriate Mexican authorities. This case is a prime example. To resolve Mr. Kass's claim, we would be required to determine, among other things, how Mr. Kass's work credits should be calculated under both Jalisco state law and Mexican federal law, whether Jalisco state law or Mexican federal law governs the computation of Mr. Kass's work credits, and possibly whether any of Mr. Kass's rights under the Mexican Constitution are implicated. Congress has made it clear United States courts are not to infringe on the sovereignty interests of our treaty partners by entangling themselves in such matters. We therefore conclude we lack jurisdiction over Mr. Kass's claim he is entitled to more

19

generous work credits than the Bureau of Prisons awarded him.

## IV

In the order in which it addressed and rejected Mr. Kass's claim he received a partial pardon or sentence modification, the district court ordered a hearing on the remaining contentions in the petition and also stated as follows:

> Also, given respondents' acknowledgment of the authentication of at least one of the Mexican documents advanced by petitioner to obtain relief in the computation of his sentence by BOP, and given BOP's delay in reopening petitioner's disciplinary action in light of the documentation provided United States government officials from a Mexican consulate official, the parties are directed to address the issue of whether it is now appropriate for the court to order BOP to (1) expunge from petitioner's record petitioner's related disciplinary conviction for forgery and (2) reinstate the 200 days of forfeited statutory good time credit that was forfeited in that disciplinary action.

After the hearing, the district court upheld the disciplinary proceedings because Mr. Kass had received due process, *see Wolff v. McDonnell*, 418 U.S. 539, 566-67 (1974), and because there was "some evidence" to support the charge, *see Superintendent, Mass. Correctional Inst. v. Hill*, 472 U.S. 445 (1985). The district court also found the Bureau of Prisons had restored Mr. Kass's 200 days of good-time credit in September 1994, which renders his challenge to the disciplinary proceedings largely moot.

Mr. Kass now renews his contention the district court should have expunged his disciplinary record. He does not seriously challenge the district court's conclusion the Bureau of Prisons complied with the procedural requirements of *Wolff*, and that there was "some evidence" to support

20

the charges against him, as required under *Hill*, and we see no basis for such a challenge.  Instead, he reads *Hill* as holding that a disciplinary finding that is supported by some evidence may nevertheless be set aside as "arbitrary."  He goes on to argue the disciplinary decision was arbitrary because the Bureau of Prisons supposedly had a duty to investigate the validity of the documents purporting to show he had received a partial pardon by contacting the appropriate Mexican authorities, and to the extent the Bureau of Prisons breached this duty, it acted arbitrarily.  Had the Bureau of Prisons conducted such an investigation and gathered additional evidence, Mr. Kass contends the DHO would have concluded Document A/27/90 was genuine.  We are not persuaded the Bureau of Prisons had such a duty, and we view Mr. Kass's tortured reading of *Hill* as little more than a thinly veiled attempt to transform the "some evidence" standard announced in *Hill* into de novo review.

Mr. Kass also contends the DHO's finding was necessarily arbitrary because the district court later concluded, on the basis of a more complete record, that "[t]here [was] sufficient support in the record for the court to accept and consider all four documents in deciding whether [Mr. Kass was] entitled to habeas corpus relief."  According to Mr. Kass, "when subsequent evidence turns up which flatly contradicts the charge of forgery, then the Government's obstinate clinging to the disciplinary conviction becomes arbitrary."  Again, we view this contention as an invitation to transform the "some evidence" standard into de novo review, in blatant disregard of the Supreme Court's holding in *Hill*.

**AFFIRMED**.

21