**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES EDWARD VERNER,

Petitioner,

v.

UNITED STATES PAROLE
COMMISSION,

Respondent.

No. 96-9530

---

**APPEAL FROM THE UNITED STATES**
**DEPARTMENT OF JUSTICE – PAROLE COMMISSION**
**(U.S.P.C. NO. 42533-066)**

---

Howard A. Pincus, Assistant Federal Public Defender (Michael G. Katz, Federal
Public Defender, with him on the briefs), Denver, Colorado, for Petitioner.

Michael A. Stover, General Counsel, United States Parole Commission, Chevy
Chase, Maryland, for Respondent.

---

Before **ANDERSON** , **KELLY** , and **HENRY** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

James Edward Verner appeals the decision of the United States Parole Commission (the "Commission") sentencing him to life imprisonment with no possibility of parole following his transfer from the Canadian to the United States penal system. We have jurisdiction over this appeal pursuant to 18 U.S.C. § 4106A(b)(2)(A), (B) (Commission's decision is appealable to court of appeals which is to "decide and dispose of" appeal as though the decision were a sentence imposed by a federal district court.). We affirm.

## BACKGROUND

In 1976, Verner was convicted in Canada of second-degree murder and sentenced to life imprisonment. [1] In 1985, he pleaded guilty to second-degree murder of a fellow inmate and received another life sentence. In 1989, Verner was found guilty of first-degree murder in connection with the murder of another inmate. [2] It is the Commission's disposition of his 1989 conviction and sentence which Verner now disputes.

---

[1] Two months later, Verner received several lesser concurrent sentences on convictions of armed robbery, rape, attempted murder, and other crimes. R. Tab 9, ¶ I.B.2.

[2] Verner denied his involvement in this murder and initially appealed his conviction, but apparently he withdrew the appeal to facilitate his transfer to the United States. See R. Tab 1, Progress Summary Appraisal and Recommendation, Oct. 22, 1990, at unnumbered p.7.

## A. The 1989 Canadian Conviction

Although the record contains no copy of his sentence of conviction for the 1989 murder, it is undisputed that the judgment and sentence were rendered pursuant to Canadian law, which provides in pertinent part that "[e]very one who commits first degree murder . . . shall be sentenced to imprisonment for life," and that the "sentence of imprisonment for life . . . is a minimum punishment." R.S.C., ch. 46, § 235(1),(2) (Can.). Canadian law further provides that "the sentence to be pronounced" for first-degree murder shall be "imprisonment for life without eligibility for parole until [the prisoner] has served twenty-five years of his sentence." Id. § 742(a). However, "no person who has been sentenced to imprisonment for life without eligibility for parole for a specified number of years . . . shall be considered for parole . . . until the expiration . . . of his specified number of years of imprisonment without eligibility for parole." Id. § 747.

## B. The Subsequent Transfer

In 1990, Verner sought a transfer to the United States pursuant to the Treaty Between the United States of America and Canada on the Execution of Penal Sentences, Mar. 2, 1977, U.S.-Can., 30 U.S.T. 6263 (the "Treaty"). [3] See R.

---

[3]The treaty was implemented by Pub. L. No. 95-144 (codified in part at 18 U.S.C. §§ 3244, 4100-4115).

Tab 5, Postsentence Report at 10. As required by the terms of the Treaty and its implementing statutes, Verner appeared at a transfer hearing at which he was informed, *inter alia*, that 1) only Canada could modify or set aside his conviction or sentence; and 2) his sentence would be "carried out according to the laws of the United States and that those laws are subject to change." 18 U.S.C. § 4108(b)(2); see Treaty Arts. IV(1), V. At the hearing, Verner apparently consented to and received his transfer.

### C. **The Commission's Disposition**

The Treaty's implementing statute, 18 U.S.C. § 4106, governs the Commission's treatment of a transferred offender who committed his offense before November 1, 1987, and provides that the offender may be released on parole at such time as the Commission may determine. Section 4106A governs the treatment of a transferred offender whose offense was committed on or after November 1, 1987, and provides that the Commission shall set a release date and a period and conditions of supervised release according to United States Sentencing Commission Guidelines.

In 1995, Verner applied to the Commission for parole. R. Tab 3. After a full hearing, the Commission determined that Verner would be eligible for a parole consideration hearing in the year 2011 on his sentences for offenses

committed before November 1, 1987.   Id. Tab 17.  At the same time, the

Commission determined that, under the sentencing guidelines, Verner's offense

level for the 1989 murder was 43 and his criminal history category was 1.    [4]  Id.

Tab 18.  Consequently, the Commission set Verner's sentence of imprisonment at

the "full term of the foreign sentence,"    *i.e.*, life.   Id.; U.S.S.G. Ch.5, Pt.A.  Verner

now appeals the latter decision, contending that the Commission's application of

18 U.S.C. § 4106A(b)(1)(A) to translate his 1989 parolable Canadian sentence to

a nonparolable sentence under the guidelines violates the Treaty and 18 U.S.C.

§ 4105.


## DISCUSSION

### A.  Waiver

The Commission first argues that Verner waived his right to challenge the

authority of the United States to impose his sentence under 18 U.S.C. § 4106A.

Pursuant to § 4107(b)(2), Verner allegedly consented to the condition that "the

sentence . . . be carried out according to the laws of the country to which he is to

be transferred and that those laws are subject to change."  18 U.S.C. § 4107(b)(2).

 By voluntarily consenting to the transfer, the Commission argues, Verner has

---

[4]Verner's other foreign convictions were excluded from his criminal history
computation pursuant to U.S.S.G. § 4A1.2(h).

waived the right to challenge the applicability of the sentencing guidelines, which contain no parole availability, to his sentence. Verner responds that he has not forfeited his right to challenge the sentence imposed by the Commission, either by consenting to the transfer or by any other means.

We agree with Verner that he has not waived or otherwise forfeited his right to challenge the propriety of his life sentence. To the extent the Commission argues that a transferred offender could never challenge the sentence imposed as a result of his transfer, we reject that argument. As 18 U.S.C. § 4106A(b)(2)(A) provides, the Commission's determination of a sentence can be appealed, and the reviewing court will examine the sentence in accordance with 18 U.S.C. § 3742, which permits a challenge to a sentence imposed in violation of the law. In our view, the Commission does not, and could not, seriously argue that a defendant could never challenge his sentence imposed following a transfer in accordance with the Treaty. Rather, it argues that in this particular case, Verner unquestionably consented to the transfer with the full knowledge that his sentence imposed under the guidelines might not include parole. Because we conclude that the record in this case is insufficient to permit us to determine how clearly and knowingly Verner consented to the transfer and its consequences under United States law, we decline to hold that he has waived or forfeited his

right to challenge the sentence imposed. We therefore proceed to the merits of his claim.

**B. Treaty and Implementing Statutes**

Verner argues that, while the Commission technically complied with 18 U.S.C. § 4106A in calculating his sentence, the application of that section to him violates § 4105 and Treaty Articles III(9) and V. We address each section in turn. We review the Commission's sentencing determination under the Treaty and implementing statutes using the same standards we apply on the direct appeal of a district court's sentencing determination—we review legal conclusions de novo, while we give deference to the Commission's application of the law to the underlying facts. See 18 U.S.C. § 4106A(b)(2)(B); Trevino-Cesares v. United States Parole Comm'n, 992 F.2d 1068, 1070 (10th Cir. 1993).

§ 4106A(b)(1)(A) provides:

> The United States Parole Commission shall, without unnecessary delay, determine a release date and a period and conditions of supervised release for an offender transferred to the United States to serve a sentence of imprisonment, as though the offender were convicted in a United States district court of a similar offense.

The Commission in this case did exactly that—it calculated a sentence for Verner under the sentencing guidelines as if he had been convicted of the same offense for which he had been convicted in Canada. The critical difference, of course,

between the Commission's sentence and Verner's Canadian sentence is that, in accordance with the sentencing guidelines, the Commission was unable to include a provision for parole, whereas his Canadian sentence provided for parole eligibility after twenty five years. [5]

### 1. **Treaty Article III(9)**

Verner argues that the Commission violated Article III(9) of the Treaty in determining his sentence under § 4106A. Article III(9) provides as follows:

> Each Party shall establish by legislation or regulation the procedures necessary and appropriate to give legal effect within its territory to sentences pronounced by courts of the other party and each party agrees to cooperate in the procedures established by the other Party.

We find no merit to Verner's argument.

---

[5]In 1977, when the Treaty was signed, United States federal law generally provided that a person serving a life sentence would be eligible for release on parole after serving a period of years. See 18 U.S.C. § 4205(a), *repealed by* the Sentencing Reform Act of 1984 ("SRA"), Pub. L. 98-473, Title II, § 218(a)(5), 98 Stat. 2027. Under the SRA, which was in effect at the time of Verner's transfer and which applies to offenses committed after Nov. 1, 1987, parole was eliminated in favor of more uniformly determined, definite release dates combined with supervised release. However, although the sentencing guidelines do not provide for parole, per se, the historical application of parole has figured into the guideline ranges actually imposed. See 28 U.S.C. § 994(m). That is, guideline ranges are based upon pre-guidelines data respecting average sentences actually served, which data includes, inter alia, the impact of parole guidelines. See generally United States Sentencing Commission Guidelines Manual, Ch.1, Pt.A. Verner does not raise any constitutional ex post facto claims in this case.

Initially, we observe that Article III(9) speaks primarily to the establishment of procedures. Verner cannot seriously argue that procedures were not established and followed in this case. Indeed, it is the very procedures followed by the Commission in determining his sentence that generate his complaint. Rather, Verner's quarrel is with the outcome in his particular case of the procedures followed, and sentencing calculation made, by the Commission.

Thus, assuming *arguendo* that Article III(9) confers some substantive right upon a transferred offender, we still conclude Verner's argument fails for several reasons. [6] First, the obligation is to give "legal effect" to a foreign sentence. Obviously, the sentence can only be given "legal effect" if it is translated to a sentence in the receiving state, in accordance with the laws of the receiving state. Indeed, Article IV(1) of the Treaty states just that:

> Except as otherwise provided in this Treaty, the completion of a transferred Offenders [sic] sentence shall be carried out according to the laws and procedures of the Receiving State, including the application of any provisions for reduction of the term of confinement by parole, conditional release or otherwise.

[6]While we have earlier held that Verner has not waived his right generally to challenge his sentence imposed following his transfer, we do not hold that he necessarily has standing to challenge the application of all Treaty provisions. See Diggs v. Richardson, 555 F.2d 848, 851 (D.C. Cir. 1976) (expressing the general rule that a "treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.") (quotation omitted).

By its very terms, "any" provisions relating to parole in the receiving state are applied, including presumably provisions providing for fixed release dates and supervised release, instead of parole. [7] The legislative history of the implementing statutes makes it abundantly clear that the laws and standards of the receiving state *shall* apply, and that Congress' primary concern was that transferees be placed on an equal footing with domestic offenders who have committed similar offenses. [8]

---

[7]The term "parole" is not defined in the Treaty, but rather in the implementing statutes. When it passed the SRA, Congress amended the definition of "parole" as set forth in the Treaty's implementing statutes to "includ[e] a term of supervised release pursuant to section 3583." 18 U.S.C. § 4101(f). Clearly, for purposes of carrying out the Treaty in light of the SRA, Congress intended that supervised release would serve as the functional equivalent of traditional parole. Therefore, the Commission's application of § 4106A(b)(1)(A), did provide for "parole" as defined in the Treaty context, and did give full legal effect to Verner's Canadian sentence. We therefore reject Verner's argument that Congress and the Commission simply failed to address a situation like Verner's, where his foreign sentence included eligibility for parole.

[8]The legislative history to 18 U.S.C. § 4106 emphatically and repeatedly states:

Both the treaties and the implementing legislation make it clear that the parole laws of the receiving state shall govern the release of a transferred offender. Specifically section 4106(b) of S. 1682 provides that the parole laws of the U.S. shall apply to an offender who is already on parole or who is transferred to this country to serve a sentence of imprisonment. . . . [T]he parole determination criteria . . . made specifically applicable to transferred offenders by the instant legislation[] shall be uniformly applied. In other words, the Committee expects the U.S. Parole Commission to apply the same standards and criteria to transferred offenders as are applied to U.S. offenders.

. . . Again, the Committee expects that the Parole Commission will apply

(continued...)

-10-

Moreover, at the time Verner was transferred, he was still "ineligible" for parole, and any future right to parole he may have had under his Canadian sentence simply had not yet "ripened." See R.S.C., ch. 46, § 747 (Can.) (providing that there can be no parole consideration until the expiration of the ineligibility period). Thus, Kass v. Reno, 83 F.3d 1186 (10th Cir. 1996), governs. In Kass, we considered a sentence which expressly provided that early release was conditioned upon Kass' "submit[ting] himself during his internment to a material work regimen and intellectual activities directed to achieve his readaptation to social life." Id. at 1193. Because Kass transferred prior to the time he fulfilled those conditions, we held that he forfeited any right to early release. In this case, the fact that Verner's sentence may not have expressly stated the behavior

---

[8](...continued)
the same standards to offenders transferred, based in part on the offense involved, as are applied to those convicted and sentenced by U.S. courts.

H. R. Rep. No. 95-720, at 36 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3159 (emphasis added). Later commentary again restates this condition:

> When an offender has been transferred, the following procedures govern his treatment thereafter. The original sentence would carry over to his new confinement, preserving deductions for good behavior in prison, labor done by him and pre-trial confinement. The Transferring State retains the power to grant pardon or amnesty. With these exceptions, the execution of the sentence is to be carried out according to the rules and practices prevailing in the state to which [the offender] is transferred.

Id. at 46-47 (emphasis added).

-11-

conditions which would qualify him for parole does not distinguish our analysis, since in any event, Verner's sentence required him to *serve* a period certain prior to his qualifying for parole consideration. Despite Verner's argument to the contrary, under Canadian law, his fulfillment of that term requirement is an absolute condition which he had not satisfied at the time of his transfer. By transferring before his parole eligibility accrued, Verner forfeited the right to insist on its future enforcement outside Canada.

We therefore agree with the Commission:

> The requirement for the United States to "give legal effect" to a Canadian sentence must be read in context, and it cannot be interpreted to nullify the broad grant of authority given by Article IV, part (1) to the Receiving State to enact its own laws and procedures for the completion of the term of confinement being served by the transferred offender. The Treaty clearly permits the Receiving State to "give effect" to the transferred offender's sentence by application of its own laws and criminal justice standards . . . .

Appellee's Br. at 14.

## 2. **Treaty Article V**

Verner also argues that the Commission's sentence, by not providing for parole eligibility, constitutes a modification of his Canadian sentence in violation of Treaty Article V. We disagree. Article V provides as follows:

> Each party shall regulate by legislation the extent, if any, to which it will entertain collateral attacks upon the convictions or sentences handed down by it in the cases of Offenders who have been

-12-

transferred by it. Upon being informed by the Sending State that the conviction or sentence has been set aside or otherwise modified, the Receiving State shall take appropriate action in accordance with such information. The receiving State shall have no jurisdiction over any proceedings, regardless of their form, intended to challenge, set aside or otherwise modify convictions or sentences handed down in the Sending State.

As the context of Treaty Article V and the legislative history of the implementing statutes amply demonstrate, the quoted language speaks to collateral-type review of a judgment's validity, placing exclusive jurisdiction of such proceedings with the transferring state. See H.R. Rep. No. 95-720, at 25, 41-42 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3148, 3164-65. The Article simply does not address the translation of a sentence given in the sending state to an offender who has been transferred to a receiving state and has thereby, under the express provisions of the Treaty and its implementing statutes, agreed to have his sentence fixed in accordance with the receiving state's laws. Rather, as discussed above, the Treaty separately and distinctly addresses the application of United States laws regarding the completion of a transferred offender's fixed prison term. And it in no uncertain terms requires the application of the laws of the United States—in this case the sentencing guidelines—under which there is no provision for parole. [9]

_____

[9]As we have indicated above, at the time the Treaty was enacted in 1977, parole was available, whereas it is no longer available, as such, under the sentencing guidelines.
(continued...)

-13-

### 3. **Section 4105**

Finally, we find no merit in Verner's argument that the Commission's action violates 18 U.S.C. § 4105(a), which provides that a transferred offender "shall remain in the custody of the Attorney General under the same conditions and for the same period of time as an offender who had been committed to the custody of the Attorney General by a court of the United States for the period of time imposed by the sentencing court." Id. The statute is clear as its applies to Verner's Canadian life sentence—he is transferred to the custody of the Attorney General for the same period of time under conditions equivalent to those imposed

---

[9](...continued)
However, as the implementing statutes suggest, Congress was aware of the possibility that the laws of the receiving state could change. Section 4107(b) requires verification that the offender "understands and agrees that the transfer will be subject to the following conditions: . . . (2) the sentence shall be carried out according to the laws of the country to which he is to be transferred and that those laws are subject to change." 18 U. S. C. § 4107(b)(2) (emphasis added). Thus, Verner cannot argue that elimination of parole in United States sentencing proceedings is a violation of the Treaty or its implementing statutes, nor can he argue that sentencing provisions and options as they existed at the time of the Treaty's ratification must remain static.

upon similarly sentenced domestic offenders. His sentence is life imprisonment, regardless of whether he is eligible for parole or not at some time in the future, and he is in the same custody status as a domestic offender sentenced to a term of life imprisonment. [10]

AFFIRMED.

---

[10]Although we find no ambiguity in the statute, we note the legislative history's simple interpretation that the section translates "[t]he foreign sentence to a term of imprisonment . . . into a term of imprisonment of precisely the same length to the custody of the Attorney General," and, thus "places a transferred prisoner in the same custody status as persons committed by U.S. District Courts." H. R. Rep. No. 95-720, at 34 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3146, 3157.